**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARMELITE SISTERS FOR THE AGED AND INFIRM, INC.; OZANAM HALL OF QUEENS NURSING HOME, INC.; CABRINI OF WESTCHESTER; MARIAN WOODS, INC.; DOMINICAN SISTERS, CONGREGATION OF ST. ROSE OF LIMA; SERVANTS OF RELIEF FOR INCURABLE CANCER, d/b/a ROSARY HILL HOME; MISSIONARY SISTERS OF ST. BENEDICT, INC.; MISSIONARY SISTERS OF ST. BENEDICT HOME FOR THE AGED, INC., d/b/a ST. JOSEPH'S HOME FOR THE AGED; ROMAN CATHOLIC BISHOP OF ROCKVILLE CENTRE; ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE; CATHOLIC HEALTH SYSTEM OF LONG ISLAND, INC., d/b/a CATHOLIC HEALTH; HOME FOR THE AGED OF THE LITTLE SISTERS OF THE POOR, d/b/a QUEEN OF PEACE RESIDENCE; HOME FOR THE AGED OF THE LITTLE SISTERS OF THE POOR OF THE CITY OF NEW YORK, d/b/a JEANNE JUGAN RESIDENCE, | Case No. __1:26-cv-1__396 (AMN/CBF) **VERIFIED COMPLAINT** |
|     *Plaintiffs*, | |
|     v. | |
| LETITIA JAMES, in her official capacity as Attorney General of New York; JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York; MICHAEL C. IANNUZZI, in his official capacity as the Interim Chair of the New York State Board for Professional Medical Conduct, | |
|     *Defendants*. | |

## NATURE OF THE ACTION

1.    For centuries, New York Catholics have put their faith into practice by caring for the sick with dignity and respect, and often without regard to their ability to pay. Since at least 1849, when St. Elizabeth Ann Seton opened the City's first Catholic hospital to care for dying New Yorkers during the City's cholera epidemic, that care has been delivered through explicitly Catholic institutions guided by religious faith to serve others.

2.    That tradition continues to this day. Inspired by their belief that life is a sacred and precious gift from God, Plaintiffs the Carmelite Sisters for the Aged and Infirm, the Dominican Sisters of Hawthorne, the Missionary Sisters of St. Benedict, the Little Sisters of the Poor, and the various religious orders whose hospitals eventually became Plaintiff Catholic Health have faithfully served the people of New York for over one hundred years. They have lived out the teaching to see their patients as Jesus Himself, "to cure if possible, and always to care."

3.    This Catholic commitment to providing loving care even when no cure is possible plays out daily in the homes that the Sisters have established for elderly, often impoverished, New Yorkers, and for those dying of cancer. The Sisters' Catholic faith leads them to accept death as the natural end to a life well-lived: neither artificially prolonging it through burdensome technological and medical interventions that provide no reasonable benefit, nor artificially hastening it. Above all, it means that the Sisters seek to personally provide a loving human presence

1

alongside each person—bearing witness to the ending of a uniquely beautiful and unrepeatable life.

4. The Sisters welcome New Yorkers of all faiths and none. But their homes have always been particularly important to New York Catholics who seek to live out their days in a place that welcomes and supports their beliefs.

5. New York should celebrate these efforts to help its neediest citizens. Indeed, it ought to pass legislation to support this work. At the very least, New York ought to heed federal law, which bans the use of federal healthcare funds for assisted suicide, and forbids New York from discriminating against those who, like the Sisters, refuse to participate in assisted suicide.

6. Instead, New York has put the Sisters to a stark choice: either abandon their religious beliefs regarding the sanctity of life or face significant fines and penalties.

7. Through its euphemistically-named Medical Aid in Dying Act, which builds upon requirements in the Palliative Care Information Act, New York has conscripted even religious healthcare providers and institutions to participate in the provision of physician-assisted suicide.

8. Beginning August 5, medical providers caring for terminally ill New Yorkers will have to proactively inform and counsel their patients about their "option" to kill themselves.

9. This "Suicide Counseling Mandate" is far broader than anything required by states like California, Oregon, and Washington. And jurisdictions such as New Zealand and Victoria, Australia, which have also legalized assisted suicide, expressly

forbid doctors from raising assisted suicide with their patients. Yet New York will soon require it.

10. These national and international norms against doctors raising assisted suicide with their dying patients exist for good reason. Public health researchers have extensively documented that an increase in the public discussion of suicide is often followed by an increase in suicide rates.

11. New York physicians and mental health professionals will also have to participate throughout the multi-step process of qualifying their patients to receive lethal suicide drugs.

12. And as though this were not enough, New York hospitals, nursing homes, and assisted living homes will also have to allow patients to commit suicide in their facilities, even if this jeopardizes their federal healthcare funding, like Medicare or Medicaid.

13. The many New York nurse practitioners, doctors, mental health professionals, hospitals, and care homes with religious or moral objections to participating in assisted suicide will have nowhere to go, because New York's purported "opt-out" is among the narrowest in the nation, and doesn't apply at all to independent assisted living facilities, including those run by the Benedictine Sisters. The Catholic patients who wish to die without being offered the chance to kill themselves at their lowest moment will be left out in the cold.

14. None of this is permitted by the Constitution. Indeed, the First Amendment's protections apply five times over.

3

15. First, the First Amendment's protected sphere of church autonomy requires the government to respect and stay out of matters of governance within religious institutions, such as how the Catholic Church chooses to implement its beliefs on the sanctity of human life and the decision of religious communities to form themselves around those same principles.

16. Second, its protection of the free exercise of religion prohibits the government from burdening the sincere religious beliefs of Plaintiffs and the patients they serve unless the state is furthering an interest of the highest order and using the least-restrictive means to do so—an exceedingly high bar Defendants cannot meet.

17. Third, its protections against religious gerrymanders prohibit the government from enacting legal burdens that fall uniquely on religious adherents—such as those who object to providing assisted suicide.

18. Fourth, its protections against compelled speech prevent the government from forcing Catholic doctors and nurses to speak the government's preferred, supportive message of assisted suicide.

19. And fifth, its protections for freedom of association allow the Catholic Church, its various communities, and the patients they serve, to organize themselves into like-minded communities with the same values and beliefs—the mission of which is to live faithfully according to those beliefs, for however long or short a time.

20. New York claimed that the MAID Act was passed to guarantee "the desire of patients with a terminal illness to determine for themselves how and when they die." Brad Holyman-Sigal, Sponsor's Mem. in Supp. of Bill No. S138, N.Y. State S., 2025-

4

S138, 2025-2026 Legis. Sess. (2025). But it has stripped that very choice away from the Sisters and their patients—denying the choice of a dignified death to the many New Yorkers who, following their sincere religious beliefs, wish to die in the Sisters' faith-filled homes, secure in the knowledge that they will not be urged to consider cutting short their life through suicide.

21. The Court can address these problems by enforcing federal law and the First Amendment and finding that New York cannot coerce religious providers in this way. That approach would leave the MAID Act generally in force. Alternatively, the Court could also invalidate the entire MAID Act, because it violates the Americans with Disabilities Act, the Equal Protection Clause, and the Supremacy Clause.

22. Either way, New York's effort to control religious providers and their patients is unlawful and cannot stand.

## JURISDICTION AND VENUE

23. This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

24. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

25. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because Defendants reside in the Northern District of New York. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Northern District of New York.

5

## IDENTIFICATION OF PARTIES

26. Plaintiff Carmelite Sisters for the Aged and Infirm, Inc. (the Carmelite Sisters) is a congregation of Carmelite Sisters with its motherhouse in Germantown, New York. The congregation is incorporated as a non-profit corporation under New York law.

27. Plaintiff Ozanam Hall of Queens Nursing Home, Inc. (Ozanam Hall) is a licensed skilled nursing facility co-sponsored by the Carmelite Sisters located in Bayside, New York that provides care to elderly individuals, including palliative care aimed at providing comfort for those in their final days.

28. Plaintiff Cabrini of Westchester is a licensed skilled nursing facility co-sponsored by the Carmelite Sisters located in Dobbs Ferry, New York that provides care to elderly individuals, including palliative care aimed at providing comfort for those in their final days.

29. Plaintiff Marian Woods, Inc. (Marian Woods) is a licensed adult home sponsored by the Carmelite Sisters located in Hartsdale, New York dedicated to providing care to women from a variety of professed religious communities.

30. Plaintiff Dominican Sisters, Congregation of St. Rose of Lima (the Dominican Sisters) is a congregation of Dominican Sisters with its motherhouse in Hawthorne, New York. It is an unincorporated non-profit association under New York law.

31. Plaintiff Servants of Relief for Incurable Cancer is a not-for-profit corporation, incorporated under New York law in 1901, that operates Rosary Hill Home in Hawthorne, New York.

6

32.  Plaintiff Rosary Hill Home is a licensed skilled nursing facility in Hawthorne, New York that is dedicated to the palliative care of people afflicted with incurable cancer who cannot afford to pay for their care in the final days of their lives.

33.  Plaintiff Missionary Sisters of St. Benedict, Inc. (the Benedictine Sisters) is a not-for-profit corporation, incorporated under New York law.

34.  Plaintiff Missionary Sisters of St. Benedict Home for the Aged, Inc. is a not-for-profit corporation, incorporated under New York Law. It operates St. Joseph's Home for the Aged, an assisted living residence with enhanced assisted living certification in Huntington, New York.

35.  Plaintiff Home for the Aged of the Little Sisters of the Poor, d/b/a Queen of Peace Residence, is a licensed nursing home in Queens, New York that offers skilled nursing care to impoverished residents aged 65 or older.

36.  Plaintiff Home for the Aged of the Little Sisters of the Poor of the City of New York, d/b/a Jeanne Jugan Residence is a senior living community in the Bronx.

37.  Both homes are controlled and operated by the Little Sisters of the Poor, an international Congregation of Catholic Sisters serving needy elderly people in the United States.

38. Plaintiff Roman Catholic Diocese of Rockville Centre (the Diocese) is a canonical part of the Roman Catholic Church and is the religious sponsor of Plaintiff Catholic Health System of Long Island, Inc., d/b/a Catholic Health (Catholic Health).

39. Plaintiff Roman Catholic Bishop of Rockville Centre (the Bishop) is the head of the Diocese and is responsible for administering its religious and civil functions.

7

Such duties include ensuring that all Catholic healthcare facilities within the Diocese operate in accordance with the Church's beliefs and interpreting the Church teachings set forth in documents such as the Code of Canon Law and the Catechism of the Catholic Church.

40. Plaintiff Catholic Health System of Long Island, Inc., d/b/a Catholic Health (Catholic Health) is an integrated healthcare system under the religious sponsorship of the Diocese, with a network of Catholic hospitals and other healthcare facilities and individual providers. Catholic Health is a membership corporation under New York Law whose corporate members include the Bishop and the heads of other religious orders within the Diocese.

41. Defendant Letitia James is the Attorney General of the State of New York and is responsible for bringing "an action for an injunction against" those who violate the New York Public Health Law, including the Medical Aid in Dying Act and the Palliative Care Information Act. *See* N.Y. Pub. Health Law § 12(4)-(5). She is sued in her official capacity only.

42. Defendant James V. McDonald is the Commissioner of Health of the State of New York and is responsible for enforcing the New York Public Health Law and for recovering civil penalties against those who violate the New York Public Health Law, including the Medical Aid in Dying Act and the Palliative Care Information Act. *See id.* §§ 12(2), (4), 206(1)(f). He is sued in his official capacity only.

43. Defendant Michael C. Iannuzzi is the Interim Chair of the New York State Board of Professional Medical Conduct and is responsible for conducting disciplinary

proceedings into licensed medical providers, including physicians. *See id.* § 230(7)(a). Misconduct includes, but is not limited to, "failure to comply" with state law. N.Y. Educ. Law § 6530(16). He is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### *The New York Medical Aid in Dying Act and the Palliative Care Information Act*

44. For close to 30 years, federal law has prohibited the use of federal healthcare funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." Assisted Suicide Funding Restriction Act of 1997 § 3(a)(1), 42 U.S.C. § 14402(a)(1).

45. More recently, the Affordable Care Act has made clear that "any State … that receives Federal financial assistance," including Medicaid or Medicare funds, "may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a). On information and belief, New York is one such state.

46. Despite these clear federal bans, Governor Hochul signed the New York Medical Aid in Dying Act (the MAID Act) into law on February 6, 2026, with an effective date of August 5, 2026. *See* N.Y. Pub. Health Law §§ 2899-d *et seq.*

47. In passing the MAID Act, New York's legislators claimed it advanced their interest in ensuring "the desire of patients with a terminal illness to determine for themselves - how and when they die." Holyman-Sigal, Sponsor's Mem., *supra* ¶ 20.

48. The MAID Act authorizes medical providers to prescribe lethal drugs to terminally ill patients for the purpose of ending their own life.

49. The MAID Act builds upon requirements codified in New York's Palliative Care Information Act (PCIA), which requires certain healthcare facilities and providers to inform terminally ill patients of their options for end-of-life care. *See* N.Y. Pub. Health Law §§ 2997-c *et seq.*

50. Prior to the passage of the MAID Act, the PCIA required facilities and providers to inform patients only of options for managing their pain or for obtaining whatever treatments might be available for their condition. It did not require facilities or providers to inform patients about the option to commit suicide.

51. Now that the MAID Act authorizes terminally ill patients to commit suicide, however, the PCIA and the MAID Act interact to create a "Suicide Counseling Mandate," requiring healthcare providers to inform patients of and counsel them about the option to kill themselves.

52. If a patient wants to commit physician assisted suicide, there is a relatively short process for the patient to do so. That process can be broken down into four steps: (1) informing patients and counseling them about their ability to obtain lethal drugs, (2) qualifying the patient to obtain lethal drugs, (3) prescribing the lethal drugs, and (4) the patient taking the lethal drugs to commit suicide.

10

Informing and Counseling

53. The PCIA is triggered by the diagnosis of a "terminal illness or condition," which the PCIA defines as "an illness or condition which can reasonably be expected to cause death within six months, whether or not treatment is provided." N.Y. Pub. Health Law § 2997-c(1)(d).

54. When a patient is diagnosed with a terminal illness, the PCIA requires his "attending health care practitioner," the "physician or nurse practitioner who has primary responsibility for the care and treatment of the patient," to offer to provide the patient with "information and counseling regarding palliative care and end-of-life options." *Id.* § 2997-c(1)(b), (2)(a). This includes (but is "not limited to") providing information about "the patient's legal rights to comprehensive pain and symptom management at the end of life," as well as "the prognosis, risks and benefits of the various options." *Id.* § 2997-c(2)(a); *see id.* § 2997-c(1)(a). "Where more than one physician or nurse practitioner share that responsibility, each of them has responsibility under this section, unless they agree to assign that responsibility to one of them." *Id.* § 2997-c(1)(b).

55. Now that terminally ill patients have a "legal right[]" to obtain lethal drugs to commit suicide, *see infra* ¶¶ 60-73, the PCIA requires the attending healthcare practitioner to ensure terminal patients are provided information and counseling about how to do so. *See id.* § 2997-c(1)(b), (2)(a); *see also id.* § 2899-f(1)(d) (incorporating this suicide counseling mandate into the MAID Act).

56. Under the PCIA, if the attending healthcare practitioner is unwilling or unable to provide the required information and counseling, he "shall" either "arrange

11

for another physician or nurse practitioner to do so," or else "refer or transfer the patient to another physician or nurse practitioner willing to do so." *Id.* §§ 2997-c(3), 2899-f(1)(d). Attending healthcare practitioners have no exemptions from these requirements.

57. The PCIA applies to "[g]eneral hospitals, nursing homes, organizations licensed or certified pursuant to article thirty-six of this chapter, and organizations licensed as special needs assisted living residences or enhanced assisted living residences pursuant to article forty-six-B of this chapter." *Id.* § 2997-d(2). Article 36 refers to "home care service[ ] agenc[ies]," "engaged in providing, directly or through contract arrangement, nursing services, home health aide services, or personal care services." *Id.* § 3605(1).

58. These facilities are required to "establish policies and procedures to provide patients with advanced life limiting conditions and illnesses who might benefit from palliative care … services with access to information and counseling regarding such options" and to "facilitate access to appropriate palliative care consultations and services … including but not limited to referrals consistent with patient needs and preferences." *Id.* § 2997-d(2), (3).

59. "Palliative care" includes "interdisciplinary end-of-life care … to prevent or relieve pain and suffering and to enhance the patient's quality of life." *Id.* § 2997-d(1)(a).

12

<u>Qualifying</u>

60. Once a patient has been diagnosed with a terminal illness[1] and informed of his treatment options, he can begin the process of obtaining lethal drugs to commit suicide under the MAID Act. To do so, a terminally ill patient must first make an oral request to his "attending physician." *Id.* § 2899-e(1). Similar to the PCIA, the MAID Act defines attending physician as the "physician who has primary responsibility for the care of the patient and treatment of the patient's terminal illness or condition." *Id.* § 2899-d(2). This definition does not include nurse practitioners. *See id.*

61. The physician must record the oral request with "an audio or video device," and the recording must be "permanently stored in the patient's medical record." *Id.* § 2899-e(1).

62. Once a patient has made his initial request for lethal drugs to commit suicide, the attending physician "shall examine the patient in person"—or, if an in-person visit would cause "extraordinary hardship," "via telehealth." *Id.* § 2899-f(1).

63. The attending physician must then, among other things, (1) confirm that the patient has a terminal illness, has decision-making capacity, and is requesting assisted suicide voluntarily; (2) inform the patient of the need for a consulting physician and a mental health professional to conduct independent reviews of the patient, his condition, and decision-making capacity; (3) "refer" the patient to both a

---

[1]    The MAID Act similarly defines "[t]erminal illness or condition" as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d(17).

consulting physician and a mental health professional, if the patient desires; (4) provide information and counseling regarding "end-of-life options"; (5) "ensure that the patient is making an informed decision by discussing" the medical diagnosis, the risks associated with taking assisted suicide drugs, the "probable result" of taking assisted suicide drugs (i.e., death), and other possible treatment or pain-relief options; (6) offer to refer the patient for other treatment options; (7) discuss the logistical steps for obtaining and self-administering the lethal drugs to commit suicide; and (8) explain that the patient can rescind the request for the drugs, or choose not to take the drugs even if they are prescribed, at any time. *Id.* §§ 2899-f(1), 2899-g(2).

64. Before the attending physician can prescribe the lethal drugs, the patient must see a consulting physician, who is required to examine the patient and his medical records and confirm, in writing, that the patient meets the necessary criteria to receive lethal drugs and use them to commit suicide. *Id.* § 2899-h.

65. The patient must also see a mental health professional, who "must evaluate the patient and report, in writing, to the attending physician and the consulting physician, the mental health professional's independent conclusions" about whether the patient is acting voluntarily and has decision-making capacity to make an "informed decision" to commit suicide. *Id.* § 2899-i(1).

66. After the consulting physician has confirmed that the patient is eligible, the patient needs to make a written request for lethal drugs to commit suicide. *Id.* § 2899-e(2).

14

67. In order to make a written request, the patient must (1) have been diagnosed with a terminal illness or condition by their the attending physician; (2) have had that terminal illness or condition confirmed by a consulting physician; and (3) be making "an informed decision." *Id.*

68. The patient's written request must be signed by the patient and witnessed by two adults. *Id.* § 2899-e(3)(a).

69. The MAID Act contains no exemptions for institutions or physicians that cannot comply or participate in these "qualifying" procedures.

Prescribing

70. Once the fully executed written request is completed, the attending physician can prescribe or order the lethal drugs that the patient will use to commit suicide. *Id.* § 2899-f(2).

71. Throughout this entire process, the attending physician must "ensure that all appropriate steps are carried out in accordance" with the MAID Act "before writing a prescription for medication." *Id.* § 2899-f(1)(k). Thus, the attending physician must not only participate in aiding patients to kill themselves but also supervise and facilitate the whole process—including those roles performed by consulting physicians and mental health professionals.

72. The attending physician must also document in the patient's medical records: (1) the dates of all oral requests to commit suicide using lethal drugs; (2) the written request to commit suicide using lethal drugs; (3) the attending physician's own diagnosis and prognosis, and determinations regarding the patient's decision-making capacity such as voluntariness in requesting lethal suicide drugs and informed

15

consent; (4) a separate written determination of decision-making capacity; and (5) a note indicating that all requirements under the MAID Act have been met and which steps have been taken to carry out the patient's request, including the lethal suicide drugs prescribed or ordered. *Id.* § 2899-j.

Ingesting

73.  Five days after a prescription is written, the patient can fill the prescription and self-administer the drugs to commit suicide. *Id.* § 2899-f(3)-(4).

Death Certificate

74.  The MAID Act further provides that "[t]he cause of death listed on a qualified individual's death certificate who dies after self-administering medication … will be the underlying terminal illness or condition," rather than the drugs that actually ended the patient's life. *Id.* § 2899-p(2).

75.  The MAID Act tasks the Commissioner of the New York State Department of Health (the Commissioner) with adopting "regulations establishing reporting requirements for physicians taking action under this article to determine utilization and compliance." *Id.* § 2899-q(1).

76. Pursuant to that mandate, the Commissioner proposed rules containing reporting requirements for physicians prescribing medication under the MAID Act. Those requirements state that "[f]ailure to record the underlying terminal illness or condition as the cause of death on the New York State death certificate of an individual that self-administered medication for medical aid in dying shall be corrected by the medical provider responsible for the creation of the certificate upon

16

notice from the commissioner of health." 48 N.Y. Reg. 21 (June 3, 2026), https://perma.cc/EX9X-YXL3.

Employee Immunity

77. The MAID Act also provides that a "health care provider or other person shall not be subject to employment … or contractual liability or penalty" for taking any "reasonable good-faith action" under the MAID Act, including for (1) discussing the possibility of committing suicide using lethal drugs with patients; (2) referring patients to another provider who will help them obtain lethal drugs to commit suicide; or (3) being present when patients commit suicide using the lethal drugs they have been prescribed. N.Y. Pub. Health Law § 2899-l(2).

Exemptions

78. The MAID Act exempts individual healthcare providers and healthcare facilities from certain, but not all, of the MAID Act's requirements. Individual physicians could still be required to inform, counsel, and qualify patients for assisted suicide; private healthcare facilities could still be prevented from prohibiting physicians from informing, counseling, and qualifying on-premises, or even prescribing off-premises; and assisted living homes could still be required to allow their patients to kill themselves in their facilities.

79. New York's assisted suicide counseling mandate is among the broadest in the nation. Even states like California, Oregon, and Washington do not require doctors to affirmatively raise assisted suicide with their terminally ill patients.[2]

80. New York's religious exemptions are also among the narrowest in the nation. Even states like California, Oregon, and Washington allow religious healthcare providers and facilities to opt out of all participation in assisted suicide, if that is what their faith requires.[3]

81. Studies of U.S. states that have legalized assisted suicide show an increase in suicide rates overall, particularly among older adults.[4] This result is not surprising, since researchers have found that "suicide contagion" can occur "when the exposure to suicide" of another person "influences others to attempt suicide."[5] This exposure can happen both directly (through exposure to the suicide of someone personally known) and indirectly (through media reporting about someone who has committed suicide), and the effect is much greater when the person reported about is a respected celebrity.[6]

---

[2]  *See* Cal. Health & Safety Code §§ 442.5(a)(2), 443.14(e); Or. Rev. Stat. § 127.885; Rev. Code. Wash. § 70.245.190.

[3]  *See id.*

[4]  David Albert Jones & David Paton, *How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?*, 108 S. Med. J. 599, 602 (2015) (finding "strong evidence that the legalization of [assisted suicide] is associated with increases in the rate of suicide, if assisted suicides are included").

[5]  U.S. Ctrs. for Disease Control & Prevention, *Suicide Prevention: Guidelines for Reporting a Suicide Cluster* (May 27, 2026), https://perma.cc/9FEE-EFJA.

[6]  *Id.*; World Health Org., *Preventing suicide: a resource for media professionals* at 8 (2023), https://perma.cc/F6BV-TPF5 (noting consistent results over 100 studies;

82. Due to the effects of suicide contagion, forcing Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health and their employees to inform patients about assisted suicide and qualify them to receive assisted suicide drugs in their facilities increases the risk of harm to all of their patients. This effect is most significant for Plaintiffs the Benedictine Sisters, whose home is not covered by the MAID Act opt-out.

83. These acknowledged effects of suicide contagion help explain why New Zealand and Victoria, Australia ban doctors from raising assisted suicide with their patients.[7] Indeed, it is for reasons like these that the American Medical Association opposes assisted suicide as "fundamentally incompatible with the physician's role as healer," "difficult or impossible to control," and posing "serious societal risks."[8]

84. New York, on the other hand, forces religious providers to participate fully in the informing, counseling, and qualifying stages of assisted suicide. While the MAID Act imposes no obligations on nurse practitioners (despite their duty to inform and counsel under the PCIA), individual physicians are exempt only from the very last step in the process of assisting in a patient's suicide. The MAID Act states only that

---

observing that the effect of a media report is greater when the person involved is a celebrity).

[7]    End of Life Choice Act 2019, pt 2, s 10 (N.Z.) ("Assisted dying must not be initiated by the health practitioner"); *Voluntary Assisted Dying Act 2017* (Vic) pt 1 div 8 ("Voluntary assisted dying must not be initiated by registered health practitioner").

[8]    Am. Med. Ass'n, *Opinion 5.7: Physician-Assisted Suicide*, in *Code of Medical Ethics* (2d ed. 2022), https://perma.cc/8GWM-B7LF.

19

they are not "under any duty, by law or contract, to participate in the *provision of medication* to a patient under this article." *Id.* § 2899-m(1)(a) (emphasis added).

85. This narrow exemption means physicians are required to participate in the rest of the elaborate process of informing patients about their ability to commit suicide using lethal drugs or qualifying a patient to obtain those drugs.

86. If a physician is "unable or unwilling to participate in the provision of medication to a patient," then the physician "shall transfer or arrange for the transfer, upon request, of a copy of the patient's relevant medical records to the new health care provider." *Id.* § 2899-m(1)(b).

87. New York likewise forces religious healthcare facilities to participate fully in the informing, counseling, and qualifying stages of assisted suicide. The MAID Act defines "health care facility" as "a general hospital, nursing home, or residential health care facility as defined in section twenty-eight hundred one of this chapter, or a hospice as defined in section four thousand two of this chapter." *Id.* § 2899-d(5); *see also id.* §§ 2801(2) (defining nursing home), 2801(3) (defining residential health care facility), 2801(10) (defining general hospital), 4002(1) (defining hospice).

88. The definition of "general hospital" used by both the MAID Act and the PCIA does "not include a residential health care facility, public health center, diagnostic center, treatment center" or "out-patient lodge." *Id.* § 2801(10). And the definition of "hospital"—which is used as part of the definition of "general hospital"—does "not apply to a facility or institution engaged principally in providing services by or under the supervision of the bona fide members and adherents of a recognized religious

20

organization whose teachings include reliance on spiritual means through prayer alone for healing in the practice of the religion of such organization and where services are provided in accordance with those teachings." *Id.* § 2801(1).

89. Similar to individual physicians, covered healthcare facilities can only prohibit "the prescribing, dispensing, ordering or self-administering" of lethal suicide drugs "while the patient is being treated in the health care facility." *Id.* § 2899-m(2)(a). These facilities may avail themselves of this limited exemption only if (1) "the prescribing, dispensing, ordering or self-administering is contrary to a formally adopted policy of the health care facility that is expressly based on sincerely held religious beliefs or moral convictions central to the health care facility's operating principles"; and (2) the facility informs patients of that policy prior to admission. *Id.*

90. Because they are not considered "health care facilities" under the MAID Act, assisted living homes—including "enhanced" assisted living homes that frequently care for residents until their death—are also excluded from the limited religious exemption. These homes cannot opt out of participating in the patient's suicide in any respect.

91. For healthcare facilities that *can* claim the religious exemption, an additional requirement attaches when they implement a policy barring the prescription or ingestion of lethal drugs to commit suicide. If a patient in an objecting facility requests lethal drugs to commit suicide, the objecting facility "shall" transfer the patient "promptly to another health care facility that is reasonably accessible under

21

the circumstances and *willing to permit* the prescribing, dispensing, ordering and self-administering" of lethal suicide drugs. *Id.* § 2899-m(2)(b) (emphasis added).

The MAID Act and PCIA's Collective Mandates

92. Through their sweeping obligations and limited exemptions, the MAID Act and PCIA collectively impose the following six mandates on religious institutions with objections to assisting their patients in committing suicide:

- Suicide Information and Counseling Mandate: nurse practitioners and physicians must either counsel terminal patients about the availability and benefits of killing themselves, or else help the patient find a provider who is willing do so;

- Suicide Qualification Mandate: physicians must assist any requesting terminal patient to qualify for assisted suicide, including, among other things, referring to consulting physicians and mental health professionals, recording the request for suicide, and assessing the patient's fitness for suicide;

- Suicide Drug Prescription and Ingestion Mandate: facilities that are not covered by the MAID Act, such as standalone assisted living facilities, must permit the prescription and ingestion of suicide drugs on their premises. Covered religious facilities may avail themselves of a limited exemption to prohibit the prescription and self-administration of suicide drugs;

- Suicide Referral Mandate: physicians and nurse practitioners who do not wish to participate in the Suicide Counseling Mandate, and facilities who

22

do not wish to participate in the Suicide Prescription and Ingestion Mandate, must refer patients to a "willing" provider;

- False Death Certificate Mandate: providers signing death certificates must state that the underlying terminal illness or condition was the patient's cause of death, rather than the drugs that actually ended his life;

- Unfaithful Employee Retention Mandate: covered healthcare facilities may not be able to take adverse employment actions against employees who take actions permitted by the MAID Act.

Liability

93. Any healthcare provider or healthcare facility that violates the MAID Act can be subject to "professional discipline," "civil liability," and even "criminal liability." *Id.* § 2899-r.

94. The Commissioner oversees investigations of violations of the MAID Act, the PCIA, and other provisions of the public health law and is responsible for recovering civil penalties for such violations. *See id.* §§ 12(1)-(2), (4), 206(1)(f).

95. Civil liability includes a "civil penalty" of up to $2000 for every violation of the MAID Act or of the PCIA. *Id.* § 12(1). Such civil penalties would "be recovered" by the commissioner. *Id.* § 12(2).

96. The Attorney General may also bring an action for an injunction "against any person who violates, disobeys or disregards" the MAID Act or the PCIA. *Id.* § 12(4)-(5).

23

97. Any person "who willfully violates any provision" of the MAID Act or of the PCIA can also be punished "by imprisonment" up to one year or by a fine of up to $2,000 per violation. *Id.* § 12-b(2).

98. Professional discipline is overseen by the state board for professional misconduct. If a provider is found to have committed misconduct, the Board may impose penalties on the provider including, "[c]ensure and reprimand," "[s]uspension of license" wholly or partially for a fixed period of time or until the completion of "a course of retraining" or "rehabilitation," "[l]imitation of [a] license to a specified area or type of practice," "[r]evocation of [a] license," "[a]nnulment of license or registration," "[l]imitation on" a provider's future "registration or issuance of any further license," imposition of "[a] fine not to exceed ten thousand dollars," a "requirement that a" provider "pursue a course of education," and a "requirement that a [provider] perform up to five hundred hours of public service." *Id.* § 230-a(1)-(9). Misconduct includes, but is not limited to, "failure to comply" with state law. N.Y. Educ. Law § 6530(16).

### *The Catholic Church's teachings on end-of-life care*

99. The Catholic Church teaches that all people possess human dignity because they are created in the image and likeness of God.[9] This dignity cannot be destroyed:

---

[9]    Catechism of the Catholic Church §§ 357, 1701 (CCC).

24

it "prevails in and beyond every circumstance, state, or situation the person may ever encounter."[10]

100. Catholic healthcare professionals are called to uphold that dignity, accompanying each dying person with love as they live out their last days: "[t]o cure if possible, always to care."[11]

101. The Catholic Church recognizes the deep suffering that often accompanies serious, and especially terminal, illness. The loss of autonomy, fear of becoming a burden, profound loneliness and grief, and despair are too often factors motivating the "anguished plea[s] for help and love" that become requests to end one's life.[12] The Church calls upon Catholic believers to address these deeply human concerns not by abandoning the person who is suffering, but by working to dispel these lies, "surrounding" the dying person with "a loving human and Christian presence," so that they "can overcome all forms of depression and need not succumb to the anguish of loneliness and abandonment to suffering and death."[13]

102. Such compassionate care ministers to every aspect of the human person— physical symptoms, emotional well-being, and spiritual preparation—ensuring that

---

[10] Dicastery for the Doctrine of the Faith, *Declaration "Dignitas Infinita"* (*"Infinite Dignity"*) *on Human Dignity* ¶ 1 (Apr. 2, 2024) (*Dignitas infinita*), https://perma.cc/RN2R-FT6G (formerly known as the Congregation for the Doctrine of the Faith).

[11] Congregation for the Doctrine of the Faith, *Samaritanus bonus* (*The Good Samaritan*) § I (July 14, 2020), https://perma.cc/6F56-QEXR.

[12] Sacred Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* § II (May 5, 1980) (*Iura et bona*), https://perma.cc/FEH4-37E8.

[13] *Samaritanus bonus* § V.1.

dying patients enjoy maximum quality of life and are accompanied by love and hope as they face death.

103.    Catholics are called especially to help those who are facing death to prepare spiritually for their last days.

104.    The Church recognizes that "[v]ery often illness provokes a search for God and a return to him."[14] Catholic healthcare providers and caregivers offer compassionate care that allows dying individuals to engage in this vital search, free from coercion or pressure. Indeed, faithful Catholics will often seek out Catholic healthcare providers and caregivers *because of* their ability to receive this care in such settings, which allows them to live out their faith until their natural death.

105.    Catholic providers and caregivers are also called to minister to every dying patient as though he is Jesus Christ himself. *See Matthew* 25:40 ("Amen, I say to you, **whatever you did for one of these least brothers of mine, you did for me**." (emphasis added)). Catholic healthcare providers thus tend to the sick as Christ's disciples did during his own death: lovingly giving them food and drink, tending their wounds, lightening the burden of sickness where possible and, above all, ensuring they are never alone. By "'remaining' at the bedside of the sick to bear witness to their unique and unrepeatable value," just as Christ's mother and disciples remained at the foot of the Cross, Catholic healthcare providers help to dispel the creeping despair that often accompanies serious illness.[15]

---

[14]   CCC § 1501.

[15]   *Samaritanus bonus* § II.

26

106.   Catholics also see in dying patients the hope that their suffering is not in vain. Here, too, Catholics look to Jesus Christ for guidance and consolation. Catholics believe that as he suffered, Christ also bore witness to hope that "*in* history[,] the last word never belongs to death, pain, betrayal, and suffering."[16]

107.   By "'remaining' by the side of the sick," Catholic healthcare providers and caregivers embody "a sign of love and of the hope that it contains. The proclamation of life after death is not an illusion nor merely a consolation, but a certainty lodged at the center of love that death cannot devour."[17]

108.   The Church believes that the act of suicide, by whatever means and buried under whatever euphemisms, stands directly contrary to this respect for human dignity. The Church acknowledges that "[g]rave psychological disturbances, anguish, or grave fear of hardship, suffering, or torture" can often motivate the decision to intentionally end one's life, all of which can "diminish the responsibility" for the act.[18] Nevertheless, suicide remains a grave sin as a rejection of the gift of life God has granted through his creative power and desire for a loving relationship with his creation.[19]

109.   Physician-assisted suicide is no different.

---

[16]   *Id.*

[17]   *Id.*

[18]   CCC § 2282.

[19]   *See id.*

110.    As a matter of "definitive teaching," the Church has stated "that euthanasia is a *crime against human life*" that is "an intrinsically evil act, in every situation or circumstance."[20]

111.    As expressed in the Catechism of the Catholic Church, euthanasia "constitutes a murder gravely contrary to the dignity of the human person and to the respect due to the living God, his Creator."[21] It "must always be forbidden and excluded," even if performed "in good faith," as "morally unacceptable" and a "grave sin against human life."[22]

112.    Because euthanasia constitutes "an act of homicide that no end can justify," "any form of complicity or active or passive collaboration" is also a grave sin.[23] As the Church has explained, "helping the suicidal person to take his or her own life is an objective offense against the dignity of the person asking for it, even if one would be thereby fulfilling the person's wish" because "[e]ven in its sorrowful state, human life carries a dignity that must always be upheld, that can never be lost, and that calls for unconditional respect."[24]

113.    Consistent with these teachings, the United States Conference of Catholic Bishops and Bishops throughout the Country have long opposed physician assisted

---

[20]    *Samaritanus bonus* § V.1. The Church defines euthanasia as "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated." *Iura et bona* § II.

[21]    CCC § 2277.

[22]    *Id.*; *Samaritanus bonus* § V.1

[23]    *Samaritanus bonus* § V.1.

[24]    *Dignitas infinita* §§ 51-52

suicide and its legalization.[25] That includes opposing New York's MAID Act both before and after its passage.[26]

***The Ethical and Religious Directives for Catholic Health: Binding Guidance for Catholic Healthcare in the U.S.***

114.    To guide American Catholic healthcare providers and facilities in following Catholic teaching about human dignity, the United States Conference of Catholic Bishops has published the Ethical and Religious Directives for Health Care Services. The Ethical and Religious Directives "reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person" and "provide authoritative guidance on certain moral issues that face Catholic health care today."[27]

---

[25] U.S. Conf. of Catholic Bishops, *Top Reasons to Oppose Assisted Suicide* (2017), https://perma.cc/2AUK-SEJX; Salvatore R. Matano, *Statement by the Most Reverend Salvatore R. Matano Ninth Bishop of Burlington Regarding the Legalization of Doctor-Prescribed Suicide*, U.S. Conf. of Catholic Bishops (May 20, 2013), https://perma.cc/QK56-FY9V; Massachusetts Catholic Conf., *Catholic Bishops Oppose "Death with Dignity" Initiative Petition*, Roman Catholic Diocese of Worcester (Sep. 7, 2011), https://perma.cc/PC9H-Z8WJ; Catholic Conf. of Illinois, *Stop Assisted Suicide: A Better Way Forward – A Message from the Catholic Bishops of Illinois* (Feb. 2025), https://perma.cc/FM6D-2NAZ.

[26] Timothy Michael Cardinal Dolan & Catholic Bishops of New York State, *Statement of Cardinal Dolan and the NYS Bishops on State-Sanctioned Suicide Bill*, N.Y. State Catholic Conf. (Apr. 24, 2025), https://perma.cc/H95C-VWPS; N.Y. Catholic Conf., NYS Bishops' Statement on Gov. Hochul's Plan to Sign Assisted Suicide Bill (Dec. 17, 2025), https://perma.cc/M8WQ-BK9J.

[27] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* at 4 (7th ed. 2025) (*Ethical and Religious Directives*), https://perma.cc/A7F8-DYLP.

115.    The Ethical and Religious Directives emphasize that "Catholic health care services have a duty to provide end-of-life care in keeping with Catholic teaching."[28]

116.    Thus, and consistently with Church teaching, the Ethical and Religious Directives categorically state that "Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way,"[29] because "[s]uicide and euthanasia … are never morally acceptable options."[30] Instead, such institutions must offer "[d]ying patients who request euthanasia … loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death."[31]

117.    Bolstering this point, the Ethical and Religious Directives further state that "formal cooperation" in gravely immoral actions "is always morally wrong."[32] Such cooperation occurs "not only when the cooperator shares the intention of the wrongdoer, but also when the cooperator directly participates in the immoral act, even if the cooperator does not share the intention of the wrongdoer, but participates as a means to some other end."[33] Formal cooperation includes, but is not limited to, "authorizing [it]" and "giving specific direction about carrying it out."[34]

---

[28]  *Id.* at 28 (Directive 62).

[29]  *Id.* at 27 (Directive 59).

[30]  *Id.* at 25.

[31]  *Id.* at 27 (Directive 59).

[32]  *Id.* at 31.

[33]  *Id.*

[34]  *Id.*

118. The Ethical and Religious Directives extend far beyond prohibiting only formal cooperation. They also state plainly that "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as … euthanasia [and] assisted suicide," which they identify as "the most pressing concerns" facing such facilities and their patients.[35]

119. Material cooperation occurs even where "the one cooperating neither shares the wrongdoer's intention in performing the immoral act nor cooperates by directly participating in the act as a means to some other end."[36] If the facility "contributes to the immoral activity in a way that is causally related but not essential to the immoral act itself," material cooperation has occurred.[37]

120. This includes referral. When a patient "requests a medical intervention that is not in accord with Catholic teaching, health care professionals may not refer the patient to another professional for the purpose of obtaining that intervention."[38] They may, however, help to "facilitate" a safe "transfer of care to another health care professional or facility that [the patient] has independently chosen," so long as they "avoid[] immoral cooperation."[39] Thus, while a Catholic healthcare facility would not prohibit a person from leaving the facility or from transferring records to another

---

[35] *Id*. at 32 & n. 76 (Directive 70).

[36] *Id*. at 31.

[37] *Id*.

[38] *Id*. at 16 (Directive 27).

[39] *Id*.

facility, a Catholic facility would not actively aid the person in locating or reaching another facility in order to obtain immoral treatments.

121.    Finally, the Ethical and Religious Directives impose on healthcare facilities the duty to avoid the sin of scandal, which the Church defines as "an attitude or behavior which leads another to do evil."[40] *See Matthew* 18:6. Catholics view scandal as always wrong for the example it sets. And scandal becomes a "grave offense if by deed or omission another is deliberately led into a grave offense."[41] The moral wrong of scandal also "takes on a particular gravity by reason of the authority of those who cause it or the weakness of those who are scandalized."[42]

122.    Under the Ethical and Religious Directives, facilities must avoid actions that could "lead people to conclude that [immoral] activities are morally acceptable," thus "lead[ing] people to sin."[43] Actions must also be "refused … because the Church's witness might be undermined."[44]

### Carmelite Sisters for the Aged and Infirm

123.    The Carmelite Sisters for the Aged and Infirm was founded in 1929 by Venerable Mother Angeline Teresa after she felt a calling from God to care for elderly New Yorkers of every socioeconomic status.

---

[40]  CCC § 2284.

[41]  *Id.*

[42]  *Id.* § 2285.

[43]  *Ethical and Religious Directives* at 31.

[44]  *Id.* at 33 (Directive 71).

124. Venerable Mother Angeline believed that the elderly often feel alone and frightened, and that deep human connection is the best way to dispel these fears.

125. Governed by the philosophy that "the difference is love," Mother Angeline worked to create healthcare facilities that "clasp the hand of an aged person and give meaning to the autumn of life."[45]

126. Today, the Carmelite Sisters continue to strive to be a mother, a sister, a daughter and a friend to someone who is another's mother, sister, friend and loved one, "provid[ing] the full support of the human family of which every person is worthy."[46] In this way, they minister to the elderly as though they are ministering to Christ, "car[ing] for the aged and infirm with the same love and joy they would show in caring for the Lord."[47]

127. At the same time, they also serve as though they are "bring[ing] Christ to every old person under [their] care."[48] As Mother Angeline explained, "Bringing Christ means giving them His compassion, His interest, His loving care, His warmth—morning, noon and night!"[49]

---

[45] The Congregation of The Carmelite Sisters for the Aged and Infirm, *Mission and Core Values* (2025).

[46] The Congregation of The Carmelite Sisters for the Aged and Infirm, *Constitutions* at 98 (1986) (Carmelite Sisters' Constitution).

[47] *Id.* at 38.

[48] *Id.*

[49] *Id.*

128. The Carmelite Sisters now serve in thirteen facilities across seven states and Ireland, all of which serve the aged of every socioeconomic class, "regardless of religious belief or affiliation."[50]

129. Several homes are located in New York, including Ozanam Hall, a 432-bed facility offering short-term rehabilitation, skilled nursing, dementia care, and palliative care located in Queens; Cabrini of Westchester, a 306-bed skilled nursing facility located in Dobbs Ferry; and Marian Woods, a 50-bed adult home and convent located in Hartsdale.

130. At each of these homes, the Carmelite Sisters care for the spiritual needs of the person by offering daily Mass as well as services in other faith traditions. They pray daily with residents, and increase those prayerful efforts as a resident approaches death. At the Carmelite Sisters' homes, no resident ever dies alone.

131. Residents and their families choose to seek admission at the Carmelite Sisters' homes because of the Catholic healthcare they provide.

132. The Carmelite Sisters see the fruits of the loving—and life-giving—care with which they surround their residents. When residents have to transfer to another facility for medical care, the Sisters have observed that some have notably declined in their physical health or state of mind while away, and experience renewal when they are able to return.

---

[50] The Congregation of The Carmelite Sisters for the Aged and Infirm, *Guiding Principles* at 1.

34

133. Ozanam Hall and Cabrini of Westchester qualify as a nursing home under the PCIA and as a healthcare facility under the MAID Act. Marian Woods is a licensed adult care facility that qualifies for the religious exemption under the MAID Act because it is "operated" by "the same corporate entity" as Ozanam Hall and Cabrini of Westchester. N.Y. Pub. Health Law § 2899-m(2)(a).

134. The Carmelite Sisters currently care and will care for those who have or who will have a terminal illness or condition as defined by the MAID Act and PCIA at each of these facilities.

135. The Carmelite Sisters receive federal funding as defined by the Assisted Suicide Funding Restriction Act of 1997. 42 U.S.C. § 14402(d).

136. The Carmelite Sisters serve residents with disabilities as defined by the Americans with Disabilities Act. *Id.* §§ 12102(1)(A), (2)(A), 12131(2).

137. The Carmelite Sisters "uphold the authentic teaching of the Roman Catholic Church and philosophy of [their] Foundress, Mother M. Angeline Teresa, regarding the value and right to life of each person from conception throughout the stages of living."[51] They further believe that this sanctity of life cannot be inhibited by limitation, disease, or condition, but is a "basic right" belonging to every person.[52]

138. The Carmelite Sisters uphold this sanctity of life in every aspect of their care for the elderly. This means that they believe "each person is special, a unique being, created by the Almighty as the object of His personal love. Since life is a gift

---

[51] Carmelite Sisters' Constitution at 97.

[52] *Id.* at 39.

35

from God, the human person is worthy of respect and dignity in all stages—from conception to death—and entitled to quality in care of the whole person, body, mind and soul."[53]

139.    This also means that the Carmelite Sisters believe that "sickness, suffering and death" can become "potential occasions of experiencing God," especially when accompanied by "hope, healing and comfort."[54]

140.    Finally, because of their Catholic beliefs, the Carmelite Sisters "do not hasten[,] nor do [they] prolong the dying process."[55] But because of their belief "that the life of every human being is sacrosanct," they view euthanasia and assisted suicide as "unconscionable and totally unacceptable."[56] They have therefore "publicly state[d] that [they] are opposed to … euthanasia [and] assisted suicide."[57]

141.    In keeping with these beliefs, the Carmelite Sisters and each of their homes follow the Ethical and Religious Directives. This includes requiring all employees, volunteers, medical providers, and clinical contractors to follow the Ethical and Religious Directives.[58]

142.    All employees, volunteers, medical providers, and clinical contractors are informed of the Carmelite Sisters' adherence to the Ethical and Religious Directives

---

[53]    *Id.* at 95.

[54]    *Id.* at 96.

[55]    *Id.* at 98.

[56]    *Id.* at 39.

[57]    *Mission and Core Values* at 1.

[58]    *Guiding Principles* at 1.

through, among other things, their Guiding Principles, their Mission and Core Values, their Constitution, and their Statement on the Sanctity of Life.

143. The Carmelite Sisters have in the past parted ways with an employee who was acting inconsistently with core teachings on the sanctity of human life off-premises.

144. Consistent with Catholic doctrine and the Ethical and Religious Directives, the Carmelite Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with assisted suicide at Ozanam Hall, Cabrini of Westchester, or Marian Woods.

145. Because of the Carmelite Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors:

- to inform residents about, or to discuss with residents, the option to end their lives with lethal drugs, either on- or off- their premises;

- to take any other step that would facilitate the provision of lethal drugs to their residents for the purpose of ending their lives;

- to record oral or written requests by their residents to obtain drugs to end their lives in the residents' medical files;

- to certify or to examine residents in order to certify their fitness to receive lethal drugs in order to end their lives, either on- or off-premises;

- to prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the resident's own life, either on- or off-premises;

37

- to allow residents to self-administer lethal drugs at their homes for the purpose of ending their own lives;

- to be present when residents use lethal drugs to end their own lives;

The Carmelite Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

146. The Carmelite Sisters will not prevent a resident from transferring out of Ozanam Hall, Cabrini of Westchester, or Marian Woods to undertake the process of obtaining lethal drugs to commit suicide at another healthcare facility of the reisdent's choosing, nor will they refuse to transfer a resident records to a new provider or facility if the resident has already independently identified a new provider or facility.

147. However, because of the Carmelite Sisters' beliefs about the sanctity of life, they will not allow employees, volunteers, medical providers, or clinical contractors to help a resident to locate or identify a provider who will assist in their fitness to receive lethal drugs to commit suicide. The Sisters would consider this to be cooperation with the evil of assisted suicide and cause grave scandal.

148. Taken together, all of these measures allow the Carmelite Sisters to engage in a healthcare ministry consistent with their and their residents' sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of the Carmelite Sisters' adherence to Catholic teaching that they are able to offer residents a healthcare setting where they can live, for as long as they will, by their own beliefs.

### *The Dominican Sisters of Hawthorne*

149.   The Dominican Sisters of Hawthorne's work caring for those with incurable cancer began in the autumn of 1896, when Rose Hawthorne Lathrop—daughter of Nathaniel Hawthorne—started caring for a single homeless cancer patient in two little rented rooms in New York City.

150.    Rose felt called to provide free care for the poor with incurable cancer after hearing about a seamstress who died alone of cancer without medical care because of her poverty. As she later recounted, "A fire was then lighted in my heart, where it still burns … I set my whole being to endeavor to bring consolation to the cancerous poor."

151.   As a result of this calling from God, she enrolled in a nursing course at the age of 45. Upon completion in 1896, she rented two rooms in Manhattan's lower east side, then the most destitute part of the city, where she began caring for the poor afflicted with many grave illnesses.

152.   Eventually, a woman suffering from cancer of the face came to Rose, begging for help. At that time, there was little to be done for facial cancers, which often left those suffering with them physically deformed. Since many thought cancer was contagious, those afflicted with these terrible diseases were often cast out completely from society.

153.   But Rose took the woman into her flat, proclaiming that she could "take the lowest class both in poverty and suffering (the cancerous poor) and put them in such a condition, that if our Lord knocked at the door we would not be ashamed to show what we had done."

39

154.    By 1899, and undeterred by the sacrifices required, Rose purchased a home where she cared for 15 terminally ill female cancer patients.

155.    In 1900, Rose—who had by now entered the Dominican order and taken the religious name Mother Mary Alphonsa—founded the Dominican Congregation of St. Rose of Lima. Today, the congregation is more commonly known as the Dominican Sisters of Hawthorne.

156.    In 1901, Mother Mary Alphonsa opened Rosary Hill Home in Hawthorne, New York to continue her years-long ministry of caring for the poor with incurable cancer. She formed a non-profit corporation, The Servants of Relief for Incurable Cancer, to own and operate Rosary Hill Home under the direction of the Dominican Sisters.

157.    Mother Mary Alphonsa declared the Dominican Sisters' mission in opening Rosary Hill Home: "We must make our guests glad they crossed the threshold that is to be their last boundary. We must make them as comfortable and happy as if their own people had kept them and put them into the very best bedroom."

158.    In recognition of her heroic virtues, Mother Mary Alphonsa was declared Venerable by the Catholic Church in 2024.

159.    For 125 years, Rosary Hill Home has continued Mother Alphonsa's mission of "bring[ing] the healing spirit of Christ and His Church to those who were most in need, while asking nothing in return."[59] Thus, all its care "is offered in the name of

---

[59] Dominican Sisters Congregation of Saint Rose of Lima, *Constitutions and Directory* at 88 (2022) (Dominican Sisters' Constitution).

Christ and is always free" in accordance with the Home's religious mission to care for the poor suffering with cancer.[60]

160. In fidelity to their rule of life, the Dominican Sisters depend solely upon the "providence of Almighty God and the charity of the charitable public." The Sisters accept no payment from patients, their families, private insurance, or the government. Even when families want to donate to the Sisters' ministry, the Sisters have the practice of refusing those donations for at least twenty years after a patient's death.

161. Rosary Hill Home has provided free, compassionate, loving care for approximately 45,000 impoverished cancer patients in New York as they pass from this life into the next, regardless of their religious or cultural background.

162. "The philosophy of care at Rosary Hill Home is to provide a loving, peaceful, home-like environment to our Guest patients" and to "meet their physical, emotional, psychological, and spiritual needs and to give comfort and consolation, knowing we cannot offer them a cure. We respect all human life, and we cherish it as a gift from God, and we rejoice in the gift of life, both here and in eternity."

163. In accordance with their faith and religious mission, the Dominican Sisters "strive to keep the patients comfortable and happy in their last days. In all things the sisters recognize life as a gift of God and endeavor to help those in their care to accept death with peace and hope."[61]

---

[60] *Id.* at 92.

[61] *Id.* at 1.

164. The Sisters view Rosary Hill Home as God's home; they therefore strive to "welcome His poor so that we can shower His love upon them until He calls them to their eternal Home."

165. Today, Rosary Hill Home is a 42-bed skilled nursing facility that offers palliative care and comfort to cancer patients who have exhausted all cancer treatments, or have decided not to receive any more treatment, and are in financial need.

166. At least some terminal cancer patients and their families have chosen Rosary Hill Home because of the Catholic healthcare it provides.

167. The Dominican Sisters have welcomed patients from other facilities where they were treated with neglect or where the only plan of care they received was to sedate heavily until death. But in the Dominican Sisters' care for the whole person, Sisters have seen patients regain weight lost due to former neglect or lack of care, renew their desire to engage in meaningful activities, and continue to form social relationships. Within Rosary Hill's setting of life-affirming healthcare, Sisters have witnessed patients who were given months to live when they arrived go on to live with their cancer diagnoses for meaningful years longer.

168. Rosary Hill Home qualifies as a nursing home under the PCIA and as a healthcare facility under the MAID Act.

169. The Dominican Sisters currently care for and will care for those who have a terminal illness or condition as defined by the MAID Act and PCIA at Rosary Hill

42

Home. Many if not all of the Dominican Sisters' current patients meet the MAID Act and PCIA's definition of terminal illness or condition.

170. Indeed, as part of the admissions process, applicants must provide proof of a diagnosis of incurable cancer supported by documentation such as a pathology report or CT scan.

171. The Dominican Sisters serve patients with disabilities as defined by the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).

172. Rosary Hill Home is operated by around twenty Dominican sisters, as well as other employees and contractors. All Sisters are either registered nurses or certified nurses' assistants.

173. While the Dominican Sisters have employed a few nurses and nursing assistants to help tend to the needs of male patients, the Sisters personally provide most of the care given to guest patients.

174. Rosary Hill Home also retains some certified nurse aid agency employees and independent clinical contractors, including a physician who meets with patients weekly.

175. All employees and clinical contractors at Rosary Hill Home commit to conducting themselves in accordance with the teachings of the Catholic Church and the values of the Dominican Sisters.

176. As a Catholic healthcare institution, Rosary Hill Home must follow the Ethical and Religious Directives in its operation and provision of healthcare.[62] This

---

[62] *See Ethical and Religious Directives* at 10.

includes requiring all employees, volunteers, medical providers, and clinical contractors to follow the Ethical and Religious Directives.[63]

177. The Dominican Sisters follow the Catholic Church's teachings that each human person was created in the image and likeness of God and therefore possesses an innate and eternal dignity.

178. The Dominican Sisters also follow the Catholic Church's teachings that "suffering, especially suffering during the last moments of life, has a special place in God's saving plan."[64]

179. Based on the Dominican Sisters' "respect for life, the dignity of the human person, and [their] belief in death as the gateway to eternal life," they "do nothing to hasten death, nor do [they] initiate measures that would merely prolong the dying process without offering the patient any hope of improvement."[65]

180. Consistent with Catholic doctrine and the Ethical and Religious Directives, the Dominican Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with the evil of assisted suicide.

181. Because of the Dominican Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors:

---

[63] *See* Rosary Hill Home, *Statement of Values* at 2 (2024).

[64] Dominican Sisters' Constitution at 94 (quoting *Iura et bona* §§ 2, 3).

[65] *Statement of Values* at 1.

44

- to inform patients about, or to discuss with patients, the option to commit suicide with lethal drugs;

- to take any other step that would facilitate the provision of lethal drugs for the purpose of ending one's life;

- to record oral or written requests for lethal drugs in the patient's medical file;

- to certify or to examine patients in order to certify their fitness to receive lethal drugs in order to end their lives;

- to prescribe or order lethal drugs to a patient for the purpose of voluntarily ending the patient's own life;

- to allow patients to self-administer lethal drugs at Rosary Hill for the purpose of ending their own lives; or

- to be present when patients use lethal drugs to end their own lives;

The Dominican Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

182. Rosary Hill Home will not prevent a patient from transferring out of its home to undertake the process of obtaining lethal drugs at another healthcare facility of his or her choosing. Nor will it refuse to transfer a patient's records to a new provider or facility if the patient has already independently identified a new provider or facility.

183. However, because of the Dominican Sisters' beliefs about the sanctity of life, Rosary Hill Home will not allow employees, volunteers, medical providers, or clinical

contractors to help a patient to locate or identify a provider who will assist the patient in obtaining lethal drugs. The Dominican Sisters consider this to be cooperation with the evil of assisted suicide and grave scandal.

184. Rosary Hill's application form also informs potential applicants of its commitment to following the teaching of the Catholic Church, as embodied in the Ethical and Religious Directives and other Church documents. The form explicitly states: "Patients who request or require clinical interventions, counseling, or services that are not consistent with the Catholic moral tradition [and] the Ethical and Religious Directives for Catholic Health Services … e.g., Euthanasia; Assisted Suicide; … will not be admitted to Rosary Hill Home."[66]

185. Taken together, all of these measures allow the Dominican Sisters and Rosary Hill Home to engage in a healthcare ministry consistent with their and their patients' sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of the Dominican Sisters' and their employees' and volunteers' adherence to Catholic teaching that they are able to offer patients a healthcare setting where they can live, for as long as they will, by their own beliefs.

### *The Missionary Sisters of St. Benedict*

186. The Missionary Sisters of St. Benedict (the Benedictine Sisters) began with the work of Sister Jadwiga Josepha Kulezsa, who sought to bring the works of the Benedictine Sisters of Charity to Poland and parts of Eastern Europe in 1912.

---

[66] Rosary Hill Home, *Application and Pre-Admission Form* at 1 (2024).

187. Despite significant persecutions and the unfolding chaos of World War I, in 1917, Sister Jadwiga founded the Benedictine Sisters in what is now Ukraine and continued to grow their charitable ministry across Central and Eastern Europe.

188. In 1939, two Benedictine Sisters, Mother Malgorzata and Sister Witolda, were visiting the United States but were unable to return to their home country of Poland because of the Nazi invasion of that country. Despite this complete isolation, they continued their healing ministry in a house in Huntington, New York, even after World War II had ended.

189. In 1965, the Benedictine Sisters began the process of constructing a convent house and a facility for the aged in Huntington. This new facility, called St. Joseph's Home for the Aged, began operating in 1968. Since then, it has provided care to approximately 745 residents.

190. Today, St. Joseph's Home is a 60-bed assisted living residence with enhanced assisted living certification that offers residents of all faiths direction with their daily activities and some assistance with tasks such as housekeeping and laundry.

191. The Benedictine Sisters currently care for and will care for those who have a terminal illness or condition as defined by the MAID Act and PCIA at St. Joseph's Home.

192. The Benedictine Sisters serve residents with disabilities as defined by the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).

193. St. Joseph's Home is licensed as an assisted living residence with enhanced assisted living certification from the New York Department of Health.

194. St. Joseph's Home qualifies as an enhanced assisted living residence under the PCIA. St. Joseph's Home does not qualify as a "health care facility" under the MAID Act, and as a result, even the limited opt-out available to healthcare facilities does not apply to St. Joseph's Home. N.Y. Pub. Health Law § 2899-d(5).

195. Through their work at St. Joseph's Home, the Benedictine Sisters seek to "glorify the Sacred Heart of Jesus and manifest His loving touch throughout the world, honoring the elderly as invaluable members of the body of Christ."

196. From the moment a resident enters the premises, the Benedictine Sisters "greet [him] at the door as though he were Christ himself."[67] In all aspects of their care, the Benedictine Sisters seek to "provide a religious and spiritual haven for our residents to live their lives on Earth in peace and tranquility, while being treated with the utmost dignity and compassion."

197. Residents and their families have told the Benedictine Sisters that they have chosen St. Joseph's Home because of the Catholic healthcare it provides.

198. St. Joseph's Home for the Aged provides many of the same services as a traditional nursing home. It is licensed to allow its residents to age in place, within the meaning of the PCIA and the facilities it covers; and it is rare for residents to transition to more intensive care outside the Home. When residents enter the dying

---

[67] Missionary Sisters of St. Benedict Home for the Aged, Inc., *By-Laws of Missionary Sisters of St. Benedict Home for the Aged, Inc.* at 2 (Mar. 14, 2012) (Benedictine Sisters' By-Laws).

process and require 24-hour care, third-party in-home hospice providers, including Good Shepherd Hospice operated by Plaintiff Catholic Health, complement the services that the Benedictine Sisters provide.

199. The Benedictine Sisters treat residents who have entered the end of life with particular care, receiving and accompanying him as Christ himself. The Sisters take all measures to provide for these residents' physical, emotional, and spiritual care, including facilitating family visits, increasing a vigilant prayerful presence, and offering access to the Sacraments, if desired. Because of the quality of care, some dying residents have even made a recovery—which is why the Sisters have heard it said that St. Joseph's is the only place where you can "graduate from hospice"—defying their initial six-month terminal prognosis and, in some cases, living weeks or even months beyond what was expected.

200. St. Joseph's Home for the Aged is staffed by three registered nurses, all Benedictine Sisters, and other Sisters licensed as social workers or certified as home health aides.

201. The Benedictine Sisters personally provide most of the care given to residents.

202. St. Joseph's Home for the Aged also retains a small handful of employees who support the Benedictine Sisters' work caring for residents.

203. The Benedictine Sisters and St. Joseph's Home for the Aged follow the Ethical and Religious Directives in its operation and provision of healthcare.

204. Residents and employees are told about the Benedictine Sisters' Catholic religious beliefs during their orientation and continue to learn about the Benedictine Sisters' Catholic beliefs through the many actions that shape the Home's daily operations, including daily Mass, praying the Rosary, celebration of feast days, and other forms of communal prayer.

205. The Benedictine Sisters follow the Catholic Church's teachings that each human person was created in the image and likeness of God and therefore possesses an innate and eternal dignity.

206. Indeed, the care they offer flows out of their charism to care for the aged, which forbids them from offering care inconsistent with their Catholic beliefs.

207. Consistent with Catholic doctrine and the Ethical and Religious Directives, the Benedictine Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with the evil of assisted suicide.

208. Because of the Benedictine Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors:

- to inform residents about, or to discuss with residents, the option to commit suicide with lethal drugs, either on- or off- St. Joseph's premises;

- to take any other step that would facilitate the provision of lethal drugs for the purpose of ending one's life;

- to record oral or written requests for lethal drugs in the resident's medical file;

- to certify or to examine residents in order to certify their fitness to receive lethal drugs in order to end their lives;

- to prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the resident's own life;

- to allow residents to self-administer lethal drugs at St. Joseph's for the purpose of ending their own lives; or

- to be present when residents use lethal drugs to end their own lives;

The Benedictine Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

209. St. Joseph's Home for the Aged will not prevent a resident from transferring out of its home to undertake the process of obtaining lethal drugs at another healthcare facility of his or her choosing. Nor will it refuse to transfer a resident's records to a new provider or facility if the resident has already independently identified a new provider or facility.

210. However, because of the Benedictine Sisters' beliefs about the sanctity of life, St. Joseph's Home for the Aged will not allow employees, volunteers, medical providers, or clinical contractors to help a resident to locate or identify a provider who will assist the resident in obtaining lethal drugs. The Benedictine Sisters consider this to be cooperation with the evil of assisted suicide and grave scandal.

211. Taken together, all of these measures allow the Benedictine Sisters and St. Joseph's Home for the Aged to engage in a healthcare ministry consistent with their and their residents' sincere religious beliefs about the inherent dignity of natural

51

death. Indeed, it is because of the Benedictine Sisters' and their employees' and volunteers' adherence to Catholic teaching that they are able to offer residents a healthcare setting where they can live, for as long as they will, by their own beliefs.

### *The Little Sisters of the Poor*

212. The Little Sisters of the Poor (the Little Sisters) is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons regardless of race, sex, or religion for over 185 years.[68]

213. The Little Sisters were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed. Over time, other women joined St. Jeanne in a religious ministry designed to protect and care for the elderly poor.[69]

214. By the time St. Jeanne died forty years later, the Little Sisters had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

215. Today, the Little Sisters serve New Yorkers in two locations: Queen of Peace Residence (a licensed nursing home in Queens Village) and Jeanne Jugan Residence (an independent living facility in the Bronx).

216. The Queen of Peace Residence is a 53-bed facility offering independent apartments as well as a skilled nursing care unit to impoverished residents aged 65 or older.

---

[68] Little Sisters of the Poor, *Little Sisters of the Poor Mission and Vision* (2023).

[69] *Id.*

217. At the Queen of Peace Residence, the Little Sisters—several of whom are either registered nurses, licensed practical nurses, or certified nursing assistants—are directly involved in the care of their residents. To aid in this work, the Little Sisters employ ten registered nurses and several certified nursing assistants.

218. The Jeanne Jugan Residence consists of 30 studio apartments and 17 1-bedroom apartments where residents enjoy a variety of community activities and assistance with daily living tasks such as meals as needed.

219. Both homes are operated and controlled by the Little Sisters. The Queen of Peace Residence qualifies for the religious exemption under the MAID Act because it is a "health care facility" as defined by the Act. N.Y. Pub. Health Law § 2899-d(5). The Jeanne Jugan Residence qualifies for the religious exemption under the MAID Act because it is "operated" by "the same corporate entity" as the Queen of Peace Residence. *Id.* § 2899-m(2)(a).

220. The Little Sisters trust in God's providence and the kindness of others to provide for their residents' needs.

221. The Little Sisters are mindful that Jesus taught that "whatever you did for one of these least brothers of mine, you did for me." *Matthew* 25:40. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were

53

Christ himself. The Little Sisters also carry out this hospitality by living in the Homes alongside their residents, sharing a common life in love.

222. The Little Sisters strive to witness to the value of the elderly by believing in and advocating for their inviolable dignity, by recognizing their unique contributions to the Church and society, and by involving them in the activities of their Homes to develop their human potential.

223. The Little Sisters "are committed to safeguarding life in all its stages." The Little Sisters "serve the elderly in an atmosphere mindful of authentic respect for life and for the freedom of individual persons." Consistent with that commitment, the Little Sisters "categorically reject the practice of euthanasia in all its forms including physician-assisted suicide."[70]

224. Caring for the dying is the summit of the Little Sisters' service to the elderly poor. Whenever death can be foreseen, no one dies alone in a Little Sisters home. The Little Sisters maintain a constant presence with those who have entered the dying process and their families. The Sisters try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support, and often surrounding a dying resident with song and prayer until his or her final breath.

225. Because the Little Sisters care for those who are weak and dying, they strive to emphasize their respect for the uniqueness and dignity of each elderly person as they reach the end of life. They offer this respect for two reasons. First, to treat the individual with the dignity they are due as a person loved and created by God, with

---

[70] Little Sisters of the Poor, *At the Service of the Gospel of Life* at 2 (2023).

the same respect and compassion as if he or she was Jesus Christ. Second, to convey a public witness of respect for life, in the hope that they can help build a Culture of Life in our society.

226. All Little Sisters facilities share the same fidelity to the teachings of the Catholic Church. Each is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teachings, and the authority of the Church in her hierarchy.

227. The Little Sisters care for their residents "until natural death."[71] Patients "who desire euthanasia in any form, including physician-assisted suicide will not be considered for admission, or retained in the Homes of the Little Sisters of the Poor."[72]

228. Patients and their families have told the Little Sisters that they have chosen to live in their Homes because of the Catholic healthcare they provide.

229. The Little Sisters currently care for and will care for those who have a terminal illness or condition as defined by the MAID Act and PCIA at their Homes.

230. The Little Sisters serve patients with disabilities as defined by the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A), (2)(A) 12131(2).

231. The Little Sisters receive federal funding as defined by the Assisted Suicide Funding Restriction Act of 1997. 42 U.S.C. § 14402(d).

---

[71] *Little Sisters of the Poor Mission and Vision* at 2

[72] Little Sisters of the Poor, *Admission Guidelines for Applicants* at 2 (2023)

232.    The Little Sisters follow the Ethical and Religious Directives of the Catholic Church in their operation and provision of healthcare.[73]

233.    Residents and employees are told about the Little Sisters' Catholic religious beliefs during their orientation and continue to learn about those beliefs through regular religious activities at the homes, including daily Mass, praying the rosary, celebrating feast days, and other forms of communal prayer.

234.    Consistent with Catholic doctrine and the Ethical and Religious Directives, the Little Sisters believe that committing suicide, or helping to assist in that decision, is gravely immoral. They therefore take several steps to prevent any formal or material cooperation with the evil of assisted suicide.

235.    Because of the Little Sisters' beliefs about the sanctity of life, they do not allow employees, volunteers, medical providers, or clinical contractors:

- to inform residents about, or to discuss with residents, the option to commit suicide with lethal drugs, either on- or off- the Little Sisters' premises;

- to take any other step that would facilitate the provision of lethal drugs for the purpose of ending one's life;

- to record oral or written requests for lethal drugs in a resident's medical file;

- to certify or to examine residents in order to certify their fitness to receive lethal drugs in order to end their lives;

---

[73]    *Id.*

56

- to prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the resident's own life;

- to allow residents to self-administer lethal drugs on the Little Sisters' premises for the purpose of ending their own lives; or

- to be present when residents use lethal drugs to end their own lives;

The Little Sisters consider each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

236. The Little Sisters will not prevent a resident from transferring out of its home to undertake the process of obtaining lethal drugs at another healthcare facility of his or her choosing. Nor will it refuse to transfer a resident's medical records to a new provider or facility if the resident has already independently identified a new provider or facility.

237. However, because of the Little Sisters' beliefs about the sanctity of life, they will not allow employees, volunteers, medical providers, or clinical contractors to help a resident to locate or identify a provider who will assist them in obtaining lethal drugs. The Little Sisters consider this to be cooperation with the evil of assisted suicide and grave scandal.

238. Taken together, all of these measures allow the Little Sisters to care for the elderly poor in a manner consistent with their and their residents' sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of the Little Sisters' and their employees' and volunteers' adherence to Catholic teaching that they

are able to offer residents a setting where they can live, for as long as they will, by their own beliefs.

### Bishop Barres and The Diocese of Rockville Centre

239.    Formed in 1957, the Diocese of Rockville Centre (the Diocese) makes up the presence of the Roman Catholic Church in Nassau and Suffolk Counties in Long Island.

240.    The Diocese serves nearly 3 million people across both counties, including approximately 1.2 million baptized Catholics across 131 parishes and one campus parish.

241.    For decades, the Diocese has diligently ministered to members of the Long Island community, regardless of their religious affiliation. More than forty Diocesan schools provide educational opportunities for children and youth. Its ministry Catholic Charities of Long Island shares the love of Jesus Christ by providing compassionate service to the poor. And Catholic Health—a network of healthcare facilities and providers sponsored by the Diocese—treats hundreds of thousands of Long Islanders each year, regardless of faith tradition.

242.    Since 2017, the Most Reverend John O. Barres has served as the fifth Bishop of the Diocese of Rockville Centre.

243.    Among his spiritual responsibilities as shepherd for the Diocese, Bishop Barres oversees the ministry of Catholic healthcare within the Diocese. [74]

---

[74] *See* United States Conference of Catholic Bishops Administrative Committee, *The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry* at 3 (2d ed.

244.    Bishop Barres's responsibility for healthcare means that "the ultimate responsibility for interpreting and applying of the *Directives* rests with" him.[75]

245.    This in turn means Bishop Barres has the "obligation to ensure doctrinal and moral integrity in the witness and practice of all Catholic institutions within the diocese," including that all Catholic healthcare institutions follow the Ethical and Religious Directives.[76]

246.    The Bishop's consent is required before any healthcare facility may "claim the name Catholic" in his Diocese.[77] He also has the authority to withdraw that consent at any time if a healthcare facility is acting inconsistently with the Church beliefs.[78]

247.    Bishop Barres also "oversees the sacramental care of the sick" within his Diocese.[79] This includes the Sacrament of Extreme Unction, also known as Last Rites, wherein a dying person receives special prayers, anointings, and blessings in preparation for death. *See, e.g., James* 5:14-15. Where necessary and possible, the dying person also receives the Sacrament of Confession—wherein his sins are

---

2020) (*The Pastoral Role of the Diocesan Bishop*); *Ethical and Religious Directives* at 6-7.

[75]    *Ethical and Religious Directives* at 32.

[76]    *The Pastoral Role of the Diocesan Bishop* at 3.

[77]    Code of Canon Law, c. 216.

[78]    *See id.* at c. 300.

[79]    *Ethical and Religious Directives* at 7.

forgiven and he is fully reconciled with God—and the Sacrament of the Eucharist (called Viaticum, literally "food for the journey" to the next life).[80]

248.   To carry out these spiritual responsibilities, Bishop Barres leads a wide range of efforts with Catholic healthcare institutions within the Diocese designed to ensure that the Catholic identity and mission of these institutions continue to flourish.

249.   These efforts include appointing, training, and maintaining chaplains not only for each of the Catholic hospitals within the Diocese (including those at Catholic Health), but also Catholic chaplains ministering at all other non-Catholic hospitals. It also includes strengthening sacramental practices at each healthcare institution so that patients can receive the sacraments as part of their ongoing care; working with members of Catholic Health's board of directors to ensure that all healthcare services are provided consistent with Catholic teachings and the Ethical and Religious Directives; and ensuring that Catholic Health's public-facing materials reflect the religious mission of the Diocese.

250.   Additionally, Bishop Barres has issued directives adopting the Ethical and Religious Directives as the "particular law" of the Diocese and instructing all healthcare institutions and providers within the Diocese to follow them.[81]

---

[80]   Code of Canon Law, cc. 921-22.

[81]   Particular laws are ecclesiastical laws that are binding on members of the Catholic church within the specific religious territory (*e.g.*, the Diocese or Archdiocese) in which they are promulgated. *See* Code of Canon Law, c. 8 § 2, c. 12 § 3.

251.    Bishop Barres has also decreed supplementary directives and guidelines for healthcare institutions and providers in the Diocese to implement the Ethical and Religious Directives, including specifically those that concern end of life care and the ethical standard for referring medical patients.

252.    For example, consistent with the Ethical and Religious Directives, Bishop Barres has decreed that "Catholic health care institutions may not provide referrals for clinical interventions that constitute intrinsically evil actions … as this would constitute formal cooperation in moral evil. This teaching applies in particular to referrals for intrinsically evil actions including … assisted suicide."[82]

253.    Bishop Barres has also declared that "clinicians may not provide specific information to identify nearby health care providers who are known or believed to offer the unethical procedure a patient is seeking with the intent to facilitate an unethical procedure," such as assisted suicide.[83]

254.    Also consistent with the Ethical and Religious Directives, Bishop Barres' decree distinguishes between a referral—which "involves an intentional action by a clinician/cooperator to assist a patient/requestor, by providing assistance, information, and/or an authorization, to obtain a clinician intervention"—and a mere "transfer of care," which is defined as "the process of assisting a patient/requestor to initiate a clinician-patient relationship with an individual or institution of the

---

[82] Bishop John O. Barres, *Decree Establishing Supplementary Directives and Guidelines to the Ethical and Religious Directives for Catholic Health Care Services as Particular Law in the Diocese of Rockville Centre*, Diocese of Rockville Centre at 3 (Dec. 9, 2022), https://perma.cc/52HH-D4M2.

[83] *Id.* at 4.

patient's own choosing (for example, by providing medical records) without authorizing or recommending or directing the patient for any definitive treatment."[84]

255. Catholic healthcare providers and institutions within the Diocese have thus been instructed that, consistent with Catholic moral teaching, they can transfer a patient's care to another provider that was independently selected by the patient, but they cannot refer the patient to another provider so that the patient can obtain lethal drugs to perform an assisted suicide.

256. In the wake of New York's passage of its assisted-suicide act, Bishop Barres exercised his obligations to the faithful generally, and to Catholic healthcare institutions under his spiritual care specifically, by reminding them that condoning assisted suicide amounts to "a grave moral failure." Accordingly, "Catholic institutions cannot and will not participate in physician-assisted suicide. We will continue to proclaim the love of God for every individual person, created in His image, that endures in every circumstance, and we will never abandon the sick and suffering to death. We will care for them until the end of their natural lives."

257. Taken together, all of these measures allow Bishop Barres to orchestrate a healthcare ministry consistent with the Church's sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of this adherence to Catholic teaching that Bishop Barres and his Diocese are able to offer patients a healthcare setting where they can live, for as long as they will, by their own beliefs.

---

[84] *Id.*

### *Catholic Health*

258.   In 1997, the Diocese of Rockville Centre founded Catholic Health through the consolidation of several pre-existing institutions to further the religiously motivated work of caring for the poor and the sick on Long Island.

259.   The history of Catholic healthcare on Long Island stretches back over one hundred years. Near the end of the 19th century, four Sisters of St. Dominic came from Germany to aid immigrants in America and quickly established a school, an orphanage, and two hospitals. In 1894, they opened a convalescent home, which has since become known as Our Lady of Consolation Nursing and Rehabilitation.

260.   Another group of women religious, the Daughters of Wisdom, founded St. Charles Hospital in 1907 and Good Samaritan University Hospital in 1959.

261.   In 1905, nuns from the Congregation of the Infant Jesus started nursing impoverished sick people—a religious work that grew into Nursing Sisters Home Care (now called Catholic Health Home Care) and Mercy Hospital, which was established in 1913 and continues to serve Nassau County.

262.   And in 1922, the Franciscan Missionaries of Mary founded St. Francis Hospital & Heart Center, which has repeatedly been recognized as one of the leading cardiac centers in the country.

263.   Since then, these and several other Catholic healthcare institutions—including St. Catherine of Siena Hospital and St. Joseph Hospital—have continued to treat hundreds of thousands of Long Islanders each year, regardless of faith tradition.

63

264. Today, Catholic Health consists of a network of 2,000 licensed beds across five acute-care hospitals, with six hospital campuses and four cancer institute locations; three licensed nursing homes; a home health service; approximately 20 ambulatory practice sites; and a network of other physician practices. It also includes Good Shepherd Hospice, which provides both inpatient and in-home hospice care, as well as hospice care in Catholic Health's nursing and rehabilitation facilities.

265. Each of Catholic Health's hospitals qualifies as a general hospital under the PCIA, and its nursing homes qualify as nursing homes under the PCIA. Its hospitals, nursing homes, and hospice providers all qualify as healthcare facilities under the MAID Act.

266. Catholic Health receives federal funding as defined by the Assisted Suicide Funding Restriction Act of 1997. 42 U.S.C. § 14402(d).

267. Catholic Health serves patients with disabilities as defined by the Americans with Disabilities Act. *Id.* §§ 12102(1)(A), (2)(A), 12131(2).

268. Catholic Health's providers regularly discuss terminal diagnoses and palliative care options with their patients. Some of Catholic Health's current patients meet the MAID Act and PCIA's definition of terminal illness or condition.

269. Catholic Health's providers also regularly write and sign patients' death certificates.

270. Catholic Health's mission is to "humbly join together to bring Christ's healing mission and the mission of mercy of the Catholic Church expressed in Catholic health care to our communities." Catholic Health therefore "uphold[s] the

dignity of every individual and compassionately attend[s] to the religious and spiritual needs of all those [it] serve[s]."

271. This is especially true when working with patients battling life-threatening diseases. For example, the multidisciplinary cancer teams at the Catholic Health Cancer Institute not only provide top-tier medical care for patients, but also offer patients a full suite of nurse navigators, pastoral care counselors, and social workers who support cancer patients both physically and spiritually through their cancer journey.

272. Similarly, Good Shepherd Hospice strives to provide patients with both high quality medical care and spiritual comfort and support as they approach the end of their lives.

273. As part of Catholic Health's charitable, healing mission, Catholic Health hospitals cover the cost of care for people in need; subsidize the care and services provided to low-income, elderly and underserved communities; and invest in other community health initiatives to benefit Long Island communities. In 2025 alone, this led to $487 million in community benefits and investments provided by Catholic Health hospitals.

274. Catholic Health is a membership corporation governed both by its corporate members, which have the ultimate power and responsibility to ensure that Catholic Health is consistent in its Catholic identity and mission; and by its board of directors, who are responsible for operating the healthcare entities that comprise Catholic Health.

65

275. Catholic Health's corporate members include the Bishop of the Diocese of Rockville Centre, currently Bishop Barres, as well as the heads of three Catholic orders within the Diocese: the President of the Congregation of the Infant Jesus, the Provincial Superior of the Daughters of Wisdom, and the Provincial Superior of the Franciscan Missionaries of Mary. The other corporate members include five Catholic clergy and one lay Catholic member.

276. The Catholic Health corporation has a separate board of directors, who are interviewed by Bishop Barres and others to ensure each will uphold the moral and ethical teachings and practices of the Catholic Church, including those on euthanasia and assisted suicide. Each board member is required to sign a form attesting to the same.

277. All members of the board of directors work to ensure that Catholic Health's institutions carry out their work consistently with Catholic moral and ethical teachings regarding the provision of healthcare.

278. Catholic Health's board of directors includes three Catholic priests, who are traditionally appointed by the bishop of the Diocese of Rockville Centre.

279. One of the priests appointed by Bishop Barres leads the board of directors' Mission and Ministry Committee, which oversees the ethical and moral operations of Catholic Health. This includes ensuring compliance with the Ethical and Religious Directives.

280. The committee includes two sisters from the Religious Sisters of Mercy of Alma, one of whom possesses an advanced degree in bioethics and one of whom has a

66

doctorate in social work. These Sisters also serve as Senior Vice Presidents for Mission Integration. The Religious Sisters of Mercy are tasked with ensuring that Catholic ethics, identity, and mission are followed throughout the entire Catholic Health system.

281. As Catholic healthcare institutions, Catholic Health and its various facilities must follow the Ethical and Religious Directives, as interpreted by Bishop Barres.

282. Catholic Health takes this religious obligation very seriously. Catholic Health requires all employees, volunteers, medical providers, and clinical contractors to follow the Ethical and Religious Directives. Indeed, Catholic Health has previously disciplined at least one medical provider who provided care that was inconsistent with the Ethical and Religious Directives.

283. Catholic Health also provides all new employees explicit training about following the Ethical and Religious Directives.

284. Catholic Health has multiple Catholic bioethicists on staff to advise about ethical and religious issues across the Catholic Health system.

285. Catholic Health follows all of the Catholic Church's teachings regarding the sanctity of life, including those pertaining to end-of-life care. This means that Catholic Health neither artificially hastens, nor prolongs, the natural dying process.

286. Consistent with Catholic doctrine and the Ethical and Religious Directives, Catholic Health believes that committing suicide, or helping to assist in that decision,

is gravely immoral. It therefore takes several steps to prevent any formal or material cooperation with the evil of assisted suicide.

287.   Because of Catholic Health's beliefs about the sanctity of life, Catholic Health does not allow employees, volunteers, medical providers, or clinical contractors:

- to inform patients about, or to discuss with patients, the option to commit suicide with lethal drugs, either on- or off-premises;

- to take any other step that would facilitate the provision of lethal drugs for the purpose of ending one's life;

- to honor oral or written requests for lethal drugs in the patient's medical file;

- to certify or to examine patients in order to certify their fitness to receive lethal drugs in order to end their lives, either on- or off-premises;

- to prescribe or order lethal drugs for a patient for the purpose of voluntarily ending the patient's own life, either on- or off-premises;

- to allow patients to self-administer lethal drugs at its facilities for the purpose of ending their own lives; or

- to be present when patients use lethal drugs to end their own lives;

Catholic Health considers each one of these actions to amount to cooperation with the evil of assisted suicide and to cause grave scandal.

288.   Catholic Health will not prevent a patient from transferring out of its facilities to undertake the process of obtaining lethal drugs at another healthcare

facility of the patient's choosing, nor will it refuse to transfer a patient's records to a new provider or facility if the patient has already independently identified a new provider or facility.

289. However, because of Catholic Health's beliefs about the sanctity of life, it will not allow employees, volunteers, medical providers, or clinical contractors to help a patient to locate or identify a provider who will assist the patient in obtaining lethal drugs. Catholic Health considers this to be cooperation with the evil of assisted suicide and grave scandal.

290. At least some of Catholic Health's physicians and nurse practitioners that would be subject to the PCIA and the MAID Act personally share Catholic Health's religious beliefs about the sanctity of life.

291. Because of these shared beliefs, these providers will not inform patients about their ability to obtain lethal drugs to commit suicide. Nor will these providers participate in any step of the certification process for a patient seeking to obtain lethal drugs to commit suicide. Nor will these providers refer a patient to another provider or facility either to obtain information or counseling about assisted suicide or to help the patient qualify for or obtain lethal drugs to commit suicide. These providers consider each of these actions to be cooperation with the evil of assisted suicide and grave scandal.

292. Catholic Health also believes that its employees and providers must follow scriptural commands to avoid bearing false witness by swearing to something that is

69

not true.[85] Accordingly, Catholic Health will not allow employees, volunteers, medical providers, or clinical contractors to write false information on any forms, including a death certificate. Catholic Health sincerely believes this amounts to grave sin by lying about a grave matter, and constitutes the sin of scandal.

293. Catholic Health considers it bearing false witness to attest on a death certificate that a patient died of a disease when the genuine cause of death was the lethal drugs the patient ingested.

294. At least some of Catholic Health's physicians and nurse practitioners who would be subject to the PCIA and the MAID Act personally share Catholic Health's religious beliefs about the need to follow scriptural commands to avoid bearing false witness by swearing to something that is not true.

295. These providers will not write false information on any forms, including a death certificate. These providers sincerely believe this amounts to grave sin by lying about a grave matter, and constitutes the sin of scandal.

296. Taken together, all of these measures allow Catholic Health and its providers to engage in a healthcare ministry consistent with its sincere religious beliefs about the inherent dignity of natural death. Indeed, it is because of Catholic Health's adherence to Catholic teaching that it is able to offer patients a healthcare setting where they can live, for as long as they will, by their own beliefs.

---

[85] *See, e.g.*, CCC § 2476 (forbidding false witness and perjury); *Exodus* 20:16; *see also* CCC § 2284-87 (forbidding the sin of scandal).

*Effects of the Medical Aid in Dying Act on Plaintiffs*

297.   Under the MAID Act and the PCIA, the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health, under threat of civil or criminal penalties, could be required:

- to provide terminally ill patients with both information and counseling regarding the availability of assisted suicide;

- to create policies that facilitate the provision of information and counseling regarding the availability of assisted suicide to patients;

- to permit their employees and healthcare providers to provide information and counseling regarding the availability of assisted suicide to terminally ill patients;

- to permit their employees to assist with any step in the process of qualifying a patient to receive lethal drugs, including (1) recording oral requests for lethal drugs; (2) examining or certifying a patient's fitness for receiving lethal drugs; (3) referring a patient to a consulting physician and mental health specialist to help the patient become qualified to receive lethal drugs; and (4) recording written or oral requests for lethal drugs in a patient's files;

- to refer patients to a willing provider and facility that are willing to assist the patient in obtaining lethal drugs; and

- to refrain from taking any disciplinary action against an employee or healthcare provider who gives such information or counseling to a

71

terminally ill patient in violation of the institution's religious beliefs and conduct requirements—all in violation of their religious convictions.

298. If the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health conform to the government's pressure to act according to these requirements and prohibitions, they risk professional discipline and the loss of their licenses, as well as their status as Catholic institutions.

299. Under the MAID Act and PCIA, Catholic Health's physicians and nurse practitioners could be required, under threat of civil or criminal penalty or professional discipline, to provide information and counseling regarding the availability of assisted suicide to patients (or refer them to another provider who will).

300. Under the MAID Act, Catholic Health's physicians could be required, under threat of civil or criminal penalty or professional discipline, to assist with any step in the process of qualifying a patient to receive lethal drugs in order to commit suicide, as described in Paragraph 297, and to refer patients to a willing provider who would be willing to assist the patient in obtaining lethal drugs to commit suicide.

301. Under the MAID Act, Plaintiffs the Benedictine Sisters and St. Joseph's Home for the Aged must also, under threat of penalty, permit their residents to obtain and self-administer lethal drugs in their home in direct violation of their religious beliefs. If they conform to the government's pressure, they would do so in violation of their own religious beliefs and would risk losing their status as a Catholic institution.

302. Under the MAID Act, Catholic Health could be required to permit its providers, particularly those that provide in-home hospice care, to falsely state on

72

death certificates that the cause of death was the patient's underlying illness, rather than the drugs that actually ended the patient's life, in direct contravention of its religious beliefs.

303. Under the MAID Act and PCIA, Bishop Barres would be prohibited from ensuring that Catholic healthcare institutions within the Diocese are acting in accordance with Catholic teaching and the Ethical and Religious Directives, as described in Paragraphs 297-302.

304. Under the MAID Act and PCIA, the Carmelite Sisters, the Little Sisters, and Catholic Health could be required to violate the Affordable Care Act, the federal ban on using federal funding to provide assisted suicide, and the Americans with Disabilities Act. This could lead to the loss of any federal funding they receive.

305. The MAID Act and PCIA are the direct and proximate causes of these irreparable harms.

306. Plaintiffs have no adequate remedy at law.

**CLAIMS FOR RELIEF**

**Count I**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Church Autonomy Doctrine**

307. All preceding paragraphs are incorporated by reference.

308. The First Amendment's church autonomy doctrine protects the freedom of religious groups "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

73

309. This includes the freedom to make "personnel decision[s] based on religious doctrine"—including for individuals who would not qualify as ministers. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658-60 & n.2 (10th Cir. 2002).

310. It also includes the freedom to make decisions about how to approach moral issues implicating faith and doctrine, such as how to avoid direct participation in and moral cooperation with physician-assisted suicide. *See Kedroff*, 344 U.S. at 116.

311. The Ethical and Religious Directives implicate matters of church governance that must be respected by civil courts.

312. Bishop Barres' decision to incorporate the Ethical and Religious Directives as binding church law within the Diocese is a matter of internal governance that must be respected by civil courts.

313. As a matter of church government, faith, and doctrine, Bishop Barres requires that Catholic Health, and its employees respect the Catholic Church's religious beliefs prohibiting engaging in conduct contrary to the sanctity of human life, including physician-assisted suicide.

314. As a matter of church government, faith, and doctrine, the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health also require that their employees respect the Catholic Church's religious beliefs prohibiting engaging in conduct contrary to the sanctity of human life, including physician-assisted suicide, as embodied in the Ethical and Religious Directives.

74

315. The MAID Act and PCIA impermissibly intrude on these matters of internal church decision-making and governance by making it impossible for Bishop Barres, the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to operate according to and enforce the Ethical and Religious Directives.

316. The MAID Act and PCIA violate Plaintiffs' rights secured to them by the First Amendment's church autonomy doctrine by exposing them to substantial liability simply for practicing their millennia old religious beliefs.

317. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, and Bishop Barres, will suffer irreparable harm absent declarative and injunctive relief.

### Count II
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable: Categorical Exemptions

318. All preceding paragraphs are incorporated by reference.

319. "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

320. A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

321. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the

regulation at issue." *Tandon*, 593 U.S. at 62. The comparability analysis "is concerned with the *risks* various activities pose" to the government's purported interest, not the "*reasons why*" people engage in those activities. *Id.* (emphasis added).

322.   The MAID Act and PCIA are riddled with exemptions that render them not generally applicable. These exemptions include but are not limited to the following:

a.   The MAID Act covers only general hospitals, nursing homes, residential healthcare facilities, and hospices, excluding other healthcare facilities where a patient might receive a terminal diagnosis, such as an independently owned outpatient oncology clinic or practice or surgical center. N.Y. Pub. Health Law § 2899-d(5). This renders the MAID Act not generally applicable.

b.   The PCIA covers general hospitals, nursing homes, residential healthcare facilities, special needs assisted living residences or enhanced assisted living residences, and various homecare agencies, but excludes hospices—where patients frequently receive palliative care. *Id.* § 2997-d(2). This renders the PCIA not generally applicable.

c.   The PCIA's suicide counseling mandate applies only to the "physician or nurse practitioner who has primary responsibility for the care and treatment of the patient," *id.* § 2997-c(1)(b), carving out any other medical provider who may provide significant care to the patient. This renders the PCIA not generally applicable.

d.   The MAID Act only applies to the "physician who has primary responsibility for the care of the patient and treatment of the patient's terminal

76

illness or condition," *id.* § 2899-d(2), thus carving out even nurse practitioners from its scope, even though they are included in the PCIA. This categorical carve-out renders the MAID Act not generally applicable.

e. The MAID Act and PCIA provide a categorical opt-out for physicians respecting "participat[ing] in the *provision of medication* to a patient." *Id.* § 2899-m(1)(a) (emphasis added). They further provide a categorical exemption allowing covered healthcare facilities to opt out of "the prescribing, dispensing, ordering or self-administering" of lethal drugs "while the patient is being treated in the health care facility." *Id.* § 2899-m(2)(a). The MAID Act and PCIA do not allow those same facilities and providers to opt out of informing patients about such drugs, qualifying such patients to receive such drugs, or referring patients to obtain such drugs. The MAID Act and PCIA are therefore not generally applicable.

f. The MAID Act opt-out also does not apply to facilities that do not qualify as "[h]ealth care facilit[ies]" under the Act. *Id.* § 2899-d(5). This means that the opt-out does not apply to independent living facilities, assisted living facilities, or enhanced assisted living facilities. This renders the MAID Act not generally applicable.

g. The MAID Act also does not apply to facilities that are "engaged principally in providing services by or under the supervision of the bona fide members and adherents of a recognized religious organization whose teachings include reliance on spiritual means through prayer alone for healing in the practice of the religion

77

of such organization and where services are provided in accordance with those teachings." *Id.* § 2801. This renders the MAID Act not generally applicable.

h. The MAID Act and PCIA only apply to terminal patients, defined as those with conditions that "can reasonably be expected to cause death within six months, whether or not treatment is provided." *Id.* §§ 2997-c(1)(d), 2899-d(17). This categorially exempts all other seriously ill individuals, rendering the laws not generally applicable.

323. Because the law is not generally applicable, it triggers strict scrutiny.

324. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, and Bishop Barres all have sincere religious beliefs that require them to provide life-affirming care that respects the dignity of every human life, from conception until natural death. Their sincere religious beliefs prohibit them from cooperating in any gravely immoral act, including physician-assisted suicide. *See, e.g.*, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 724 (2014); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 693-96 (2020) (Alito, J., concurring) ("Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question, and our cases have made it clear that courts cannot override the sincere religious beliefs of an objecting party on that question").

325. The MAID Act and PCIA substantially burden those free exercise rights by requiring them to, among other things, inform patients about physician-assisted suicide, implement policies that facilitate the provision of information and counseling

about assisted suicide, qualify patients for assisted suicide, and refer patients seeking physician-assisted suicide to willing providers; by prohibiting them from requiring physicians and nurse practitioners to abide by church teaching on physician-assisted suicide; and by restricting their ability to form and maintain a healthcare community built on those religious beliefs.

326. The MAID Act and PCIA substantially burden Plaintiffs the Benedictine Sisters and St. Joseph's Home for the Aged's religious exercise by attempting to force them to allow even the prescribing and administration of lethal drugs on their premises, since they are not covered by the MAID Act's limited opt-out.

327. Catholic Health also maintains close relationships with its physicians and nurse practitioners, who face practical disincentives to sue, including a "fear of reprisal" by the State. *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019).

328. Bishop Barres serves as the spiritual authority responsible for guiding the faithful, including through Catholic healthcare ministries and individual Catholic healthcare providers. That role necessarily includes issuing binding moral directives on end-of-life care. The MAID Act and PCIA burden these rights by requiring Catholic providers to act contrary to that guidance, meaning he cannot ensure that healthcare is delivered in accordance with religious teaching or that the faithful can receive healthcare in accordance with that teaching.

329. Defendants have no compelling interest in forcing Plaintiffs to participate in physician-assisted suicide.

79

330. Defendants have not selected the least-restrictive means of furthering any alleged governmental interest.

331. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, and Bishop Barres, and their providers and the patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

## Count III
## 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Neutral: Religious Gerrymander

332. All preceding paragraphs are incorporated by reference.

333. Under the Free Exercise Clause, it is "never permissible" to target religious beliefs and religious status for disfavored treatment. *Lukumi*, 508 U.S. at 533.

334. Imposing "special disabilities on the basis of religious views" triggers strict scrutiny. *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 460-61 (2017).

335. "A law that targets religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson v. Makin*, 596 U.S. 767, 780-81 (2022).

336. Because the Free Exercise Clause even "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," *Lukumi*, 508 U.S. at 534, "[a] law may … be found 'not neutral in operation, as assessed in practical terms'" where it creates a "religious gerrymander." *Sughrim v. New York*, 503 F. Supp. 3d 68, 88 (S.D.N.Y. 2020) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Hum. Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014)).

337. A "religious gerrymander" occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 536.

338. The MAID Act and PCIA lack a religious exemption for information, referrals, and qualifying patients, despite the well-known fact that Catholic healthcare providers and facilities object to participating in physician-assisted suicide in any way.

339. On information and belief, most providers and institutions who object to providing information about, referring patients, or qualifying patients for physician-assisted suicide do so based on religious objections.

340. The MAID Act and PCIA thus create a religious gerrymander by targeting a subset of religiously motivated actors.

341. The MAID Act and PCIA therefore "violate[] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

342. Catholic Health also maintains close relationships with their doctors and nurse practitioners, who face practical disincentives to sue, including a "fear of reprisal" by the State. *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

343. Defendants cannot satisfy strict scrutiny because they lack a compelling interest and the law is not narrowly tailored.

344. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health and their providers, will suffer irreparable harm absent declarative and injunctive relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Compelled Speech**

345.    All preceding paragraphs are incorporated by reference.

346.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Accordingly, the Constitution does not "allow[] a government to coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative v. Elenis*, 600 U.S. 570, 598 (2023).

347.    These "First Amendment[] protections extend to licensed professionals much as they do to everyone else." *Chiles v. Salazar*, 146 S. Ct. 1010, 1022 (2026); *see NIFLA v. Becerra*, 585 U.S. 755, 766-67 (2018).

348.    When the government "compel[s] clinics [and providers] to speak the State's message, the law regulate[s] speech based on its content." *Chiles*, 146 S. Ct. at 1022 (citing *NIFLA*, 585 U.S. at 766).

349.    Such content-based laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766; *see Brown v. Ent. Merchs.*, 564 U.S. 786, 799 (2011).

350.    When the government "seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals

82

may express on that subject," the law also discriminates based on viewpoint, making "the violation of the First Amendment … all the more blatant." *Chiles*, 146 S. Ct. at 1021.

351. The MAID Act and the PCIA compel speech in ways that discriminate on both content and viewpoint.

352. The MAID Act and the PCIA force providers to advise and counsel patients about the availability of assisted suicide as a legitimate treatment option for certain patients.

353. The MAID Act and the PCIA therefore prohibit providers from advising and counseling patients about their treatment options without including assisted suicide as a treatment option for certain patients.

354. The MAID Act and PCIA are content-based because they, among other things, compel speech that "draws distinctions based on the message a speaker conveys" about assisted suicide. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The MAID Act and PCIA are therefore "presumptively unconstitutional." *NIFLA*, 585 U.S. at 766.

355. The MAID Act and the PCIA discriminate based on viewpoint because, among other things, the "specific motivating ideology" promoted by the state is that assisted suicide is a legitimate treatment option. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

356. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health are unable to speak *their* preferred message that,

consistent with their sincere religious beliefs, assisted suicide is not a legitimate treatment option for any disease.

357. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health also have a First Amendment interest in expressing and maintaining a consistent moral message; requiring them to facilitate or endorse contrary communications infringes their right against compelled speech.

358. Forcing Catholic Health and its providers to knowingly write false information on death certificates and attest to that information also constitutes compelled speech. This message is directly contrary to Catholic Health's religious beliefs concerning lying about grave matter and providing scandal.

359. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health also have an affirmative right to speak in accordance with their mission. By requiring them to allow employees to speak contrary to that message, the MAID Act infringes on the facility's free speech rights.

360. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health are threatened with professional discipline, fines, and imprisonment if they stand on their rights and speak their preferred message rather than the government's.

361. Catholic Health also maintains close relationships with its physicians and nurse practitioners, who face practical disincentives to sue, including a "fear of reprisal" by the State. *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

84

362.   Defendants have no compelling interest in forcing religious objectors to state its preferred message, nor is the law narrowly tailored.

363.   The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health and their providers will suffer irreparable harm absent declaratory and injunctive relief.

**Count V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Expressive Association**

364.   All preceding paragraphs are incorporated by reference.

365.   The Supreme Court has "long understood" that "[t]he First Amendment guarantees all Americans" a "right to associate with others." *First Choice Women's Res. Ctrs. v. Davenport*, 146 S. Ct. 1114, 1122 (2026).

366.   This freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *See id.*; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858, 862-63 (7th Cir. 2006).

367.   "[A]ssociational rights carry special significance for political, social, religious, and other minorities," and "government actions tending to curtail the freedom to associate warrant the closest scrutiny." *First Choice*, 146 S. Ct. at 1122 (cleaned up).

368.   The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health are expressive associations joined together for the

85

purpose of providing Catholic healthcare in a manner consistent with the Catholic Church's teachings on the sanctity of life, including end-of-life care.

369. In order to maintain this expression consistently, the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health must be able to hire only those providers who agree to respect their religious conduct standards regarding matters concerning the sanctity of human life, including physician-assisted suicide. This expression of belief includes Plaintiffs' view that assisted suicide is not a legitimate treatment option and that it is morally wrong to inform patients about the "benefits" of suicide, counsel patients about the benefits of suicide, qualify patients for assisted suicide, prescribe lethal drugs to accomplish assisted suicide, or refer patients to providers or facilities willing to engage in any of the above.

370. Plaintiffs The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health's religious beliefs about treating patients with dignity and the sanctity of life are central to their religious mission.

371. The MAID Act forces the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to hire or retain, and prohibits them from taking adverse action against, physicians, nurse practitioners, and mental health professionals whose words or conduct would undermine their religious expression, such as by advocating for actions inconsistent with their religious beliefs and messages. *See* N.Y. Pub. Health Law § 2899-l(2). This will force them into expressive associations that directly undermine and contradict their

86

religious expression and the Catholic way of providing care that is central to their religious mission.

372. Altogether, the sprawling requirements of the MAID Act and PCIA could force the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, and the Little Sisters, and Catholic Health to hire healthcare providers—who are the face of the organization to its patients and the beating heart of healthcare—who take actions diametrically opposed to the Catholic way of caring for the sick until natural death. Worse still, the MAID Act and PCIA could leave these Plaintiffs wholly unable to fire or otherwise discipline employees and volunteers who openly flouted those Catholic teachings, and so undermined the whole purpose of their ministries.

373. Catholic Health maintains close relationships with its physicians and nurse practitioners, who face practical disincentives to sue, including a "fear of reprisal" by the State. *N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

374. Defendants have no compelling interest justifying the infringement on the Carmelite Sisters', the Dominican Sisters', the Benedictine Sisters', the Little Sisters, and Catholic Health, their providers, and the patients they serve's freedom of association.

375. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

376. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, their providers will be harmed absent injunctive and declaratory relief.

87

**Count VI**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise of Religion**

377.   All preceding paragraphs are incorporated by reference.

378.   The Free Exercise Clause protects *both* an individual's private beliefs, *and* his acting in accordance with his faith. *See Kane v. De Blasio*, 19 F.4th 152, 163-64 (2d Cir. 2021). Thus, the government can neither prohibit religious exercise outright, nor pressure an individual to forego his religious exercise.

379.   Where a government makes it impossible for an individual to participate in his religious observances, it has "substantially burdened that religious exercise." *Sabir v. Williams*, 52 F.4th 51, 59-60 (2d Cir. 2022). This is especially salient where a policy would leave an individual "unable to engage in protected religious exercise in the final moments of his life." *Ramirez v. Collier*, 595 U.S. 411, 433 (2022).

380.   So too, "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or … denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists;" and, even if "the compulsion" is "indirect," "the infringement upon free exercise is nonetheless substantial." *Thomas v. Rev. Bd.*, 450 U.S. 707, 717-18 (1981).

381.   Consistent with their sincere religious beliefs, many of the current and prospective patients served by of Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health believe that artificially hastening natural death is gravely sinful. Also consistent with their

88

sincere religious beliefs, they do not wish to discuss, nor entertain discussion of, the so-called "benefits" of committing suicide.

382. The MAID Act and PCIA substantially burden these patients' rights to approach death consistent with their Catholic faith. Their attending physician and nurse practitioner would be required to discuss assisted suicide as a legitimate treatment option, during a time when they may already be experiencing deep distress over their terminal diagnosis and may have no interest in hearing their trusted physician suggest that they consider a course of action that their faith forbids.

383. Moreover, the MAID Act and the PCIA put these patients to a perverse choice: either seek end-of-life care from a physician or nurse practitioner who will discuss the option of suicide and its "benefits" with them as a legitimate medical treatment, or forego end-of-life care altogether.

384. As set forth above, the MAID Act and PCIA are neither neutral nor generally applicable.

385. Defendants have no compelling interest justifying the infringement on these patients' free exercise of religion.

386. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

387. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert

their own rights in a timely fashion. *See N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

388. Defendants have no compelling interest in forcing religious objectors to state its preferred message, nor is the law narrowly tailored.

389. The current and prospective patients served by the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health will suffer irreparable harm absent declaratory and injunctive relief.

**Count VII**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Freedom of Religious Association and Right of Assembly**

390. All preceding paragraphs are incorporated by reference.

391. The Supreme Court has "long understood" that "[t]he First Amendment guarantees all Americans" a "right to associate with others." *First Choice*, 146 S. Ct. at 1122.

392. This freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *See id.*; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858, 862-63 (7th Cir. 2006).

393. "[A]ssociational rights carry special significance for political, social, religious, and other minorities," and "government actions tending to curtail the freedom to associate warrant the closest scrutiny." *First Choice*, 146 S. Ct. at 1122 (cleaned up).

394. The right of assembly protected by the First Amendment also guarantees these patients the right to gather with those who share their common religious beliefs. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito, J., joined by Kagan, J., concurring)

395. Some of the current and prospective patients served by Plaintiffs wish to receive and associate with healthcare communities who agree to respect their religious conduct standards regarding matters concerning the sanctity of human life, including physician-assisted suicide. This expression of belief includes the view that assisted suicide is not a legitimate treatment option and is inconsistent with human dignity and the sanctity of life.

396. If these patients are forced to seek end-of-life care from physicians and nurse practitioners whose words or conduct would undermine their religious expression, such as by advocating for actions inconsistent with their shared religious beliefs and messages, they would be forced into expressive associations that directly undermine and contradict their religious expression.

397. These patients wish to exercise their associational rights by living out their final days in the company of those who will not infringe upon their dignity by implying, explicitly or implicitly, that voluntary suicide is a legitimate treatment option that has "benefits." By forcing patients to associate with those speaking a message that suicide is a legitimate option, Defendants have burdened that right.

398. Defendants have no compelling interest justifying the infringement on these patients' freedom of association.

91

399. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

400. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

401. The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health, and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VIII**
**42 U.S.C. § 1983**
**Violation of the Americans with Disabilities Act**

402. All preceding paragraphs are incorporated by reference.

403. Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination." 42 U.S.C. § 12132.

404. A "public entity" includes State and local governments, their agencies, and their instrumentalities. *Id.* § 12131(1).

405. Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

406. The ADA defines a qualified individual with a disability as a person who has "a physical or mental impairment that substantially limits one or more major life

activities," 42 U.S.C. § 12102(1)(A), including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," *id.* § 12102(2)(A).

407. "[M]ajor life activit[ies]" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

408. Discrimination occurs when, among other things, disabled people are offered services that are "not equal to" those provided to others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii).

409. Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health serve patients who are qualified individuals with disabilities.

410. Many of the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health's patients who receive terminal diagnoses as defined by the MAID Act and PCIA are qualified individuals with disabilities under the ADA.

411. Defendants' policy of forcing the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to inform terminally ill patients with disabilities about the option of voluntary suicide, while protecting

93

them from offering suicide to nondisabled patients, amounts to discrimination against their patients under Title II of the ADA.

412.    The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 75.

413.    The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

### Count IX
### Violation of U.S. Const. Art. VI, cl. 2.

414.    All preceding paragraphs are incorporated by reference.

415.    The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

416.    The Supreme Court has "held that state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner v. Myrick*, 514 U.S. 280, 287 (1995)).

417.    Federal law prohibits Plaintiffs the Carmelite Sisters and Catholic Health from using federal healthcare funds "to provide any health care item or service

94

furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." 42 U.S.C. § 14402(a)(1).

418. The MAID Act and PCIA compel Plaintiffs the Carmelite Sisters, the Little Sisters, and Catholic Health to violate that ban by directly funding services that facilitate assisted suicide, including but not limited to information, counseling, and qualification.

419. It is not possible to comply with both laws by separating all information and counseling related to suicide and qualification for assisted suicide from the treatment provided by the Carmelite Sisters and Catholic Health, since the MAID Act and PCIA mandate that such information, counseling, qualification, prescription, and administration be overseen by attending healthcare practitioners and attending physicians as part and parcel of the patient's general treatment.

420. It is impossible for the Carmelite Sisters, the Little Sisters, and Catholic Health to "comply with both its state-law duty to" provide these services "and its federal-law duty not to" do so. *Mut. Pharm. v. Bartlett*, 570 U.S. 472, 480 (2013).

421. "Accordingly, the state law is pre-empted." *Id.*

422. The Carmelite Sisters and Catholic Health, their providers, and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count X**
**42 U.S.C. § 18113**
**Violation of the Affordable Care Act; Prohibition against Discrimination**
**on Assisted Suicide**
**Suit in Equity**

423. All preceding paragraphs are incorporated by reference.

95

424.    The Affordable Care Act says that "any State … that receives Federal financial assistance … may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a).

425.    On information and belief, the State of New York receives Federal financial assistance within the meaning of the Affordable Care Act.

426.    The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, the "institutional health care entit[ies]" that they operate, and their "individual … health care entity" employees are within the zone of interests protected by 42 U.S.C. § 18113. *Id.*

427.    As described above and incorporated here by reference, through the MAID Act and PCIA New York discriminates against the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, the "institutional health care entit[ies]" that they operate, and their "individual health care entity" employees "on the basis that [they] do[] not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual." *Id.*

428.    The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health, their employees, and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

96

## Count XI
## 42 U.S.C. § 1983
## U.S. Const. Amend. XIV: Equal Protection

429.  All preceding paragraphs are incorporated by reference.

430.  The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

431.  The MAID Act and PCIA are unconstitutional because they treat people who are disabled by reason of a terminal illness on unequal terms with similarly situated people without a rational basis or compelling interest.

432.  The MAID Act and PCIA discriminate against people who are disabled by reason of a terminal illness, denying protections and safeguards, without any rational basis.  This undermines and interferes with New York's interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently.

433.  Diagnoses of terminal illnesses are inherently uncertain.  Some people with terminal diagnoses can make full recoveries. Others can live for many years with adequate care and treatment, such as that provided in Plaintiffs' facilities. All of these factors demonstrate the uncertainty of a terminal diagnosis and the lack of even a rational basis for this distinction.

434.  Because the MAID Act and the PCIA implicate a fundamental right—the right to live—the discrimination warrants a heightened level of review.

435.  The Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health, their providers, and the current and prospective

97

patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Issue a temporary restraining order preventing Defendants and all those acting in concert with them from enforcing any substantive provision of the MAID Act against Plaintiffs;

b. Declare that the MAID Act and PCIA violate the First Amendment by impermissibly infringing on Plaintiffs' authority to govern their internal religious affairs free from government interference;

c. Declare that the MAID Act and the PCIA violate the Free Exercise Clause of the First Amendment because they burden Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health's exercise of religion, they are not neutral, they are not generally applicable, and they do not satisfy strict scrutiny;

d. Declare that the MAID Act and the PCIA violate the Free Speech Clause of the First Amendment by compelling Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to speak the government's preferred message that assisted suicide is a legitimate treatment option;

e. Declare that the MAID Act and the PCIA violate the Free Speech Clause of the First Amendment by impermissibly compelling Plaintiffs the Carmelite Sisters, the

Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to associate with "[a]ttending health care practitioner[s]," "[a]ttending physician[s]" "[c]onsulting physician[s]," and "[m]ental health professional[s]" whose words and conduct undermine their religious message, N.Y. Pub. Health Law §§ 2997-c(1)(b), 2899-d;

f.   Declare that the MAID Act and the PCIA violate the Free Exercise Clause of the First Amendment by burdening the free exercise rights of patients receiving end-of-life care from Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health;

g.   Declare that the MAID Act and the PCIA violate the Free Speech Clause of the First Amendment by impermissibly compelling patients receiving end-of-life care at Plaintiffs' the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health facilities to associate with "attending health care provider[s]," "attending physician[s]" "consulting physician[s]," and "mental health professional[s]" whose words and conduct are directly contrary to their religious beliefs, *id.*;

h.   Declare that the MAID Act and the PCIA violate Title II of the Americans with Disabilities Act by forcing Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health to treat their disabled terminal patients differently than nondisabled patients;

i.   Declare that the MAID Act and PCIA are preempted by the Assisted Suicide Funding Restriction Act of 1997, 42 U.S.C. § 14402(a);

j. Declare that the MAID Act and the PCIA violate 42 U.S.C. § 18113 by discriminating against the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, the "institutional health care entities" that they operate, and their "individual health care entity" employees "on the basis that they do not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual";

k. Declare that the MAID Act and the PCIA violate the Equal Protection Clause of the Fourteenth Amendment by treating patients receiving end-of-life care from Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health differently on the basis that they are disabled by reason of a terminal illness;

l. Issue a preliminary and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing the PCIA's requirement that "attending health care practitioner[s]" must "provide information and counseling" regarding assisted suicide as a treatment option against Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health and all those acting in concert with them, N.Y. Pub. Health Law § 2997-c(1)(b), (2)(b);

m. Issue a preliminary and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing the PCIA's requirement to "establish policies and procedures to provide patients with advanced life limiting conditions," to provide "access to information and counseling

100

regarding" assisted suicide as a treatment option and to "facilitate access to appropriate palliative care consultations and services" regarding assisted suicide against Plaintiffs the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, and Catholic Health and all those acting in concert with them, *id.* § 2997-d(2), (3);

n.  Issue a preliminary and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing any part of the MAID Act against Plaintiffs and all those acting in concert with them, or from forcing Plaintiffs and all those acting in concert with them to participate in assisted suicide in any way that their religious beliefs forbid;

o.  Issue a preliminary and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing any part of the MAID Act against Plaintiffs on the basis that the MAID Act and the PCIA violate 42 U.S.C. § 18113 by discriminating against the Carmelite Sisters, the Dominican Sisters, the Benedictine Sisters, the Little Sisters, Catholic Health, the "institutional health care entities" that they operate, and their "individual health care entity" employees "on the basis that they do not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual";

p.  Award Plaintiffs nominal, compensatory, actual and punitive damages for the loss of their rights under federal law;

q.  Award attorneys' fees and costs under 42 U.S.C § 1988; and

101

r.  Award any such other relief as the Court may deem just and proper.

Respectfully submitted this 17th day of July, 2026.

/s/ Mark L. Rienzi
Mark L. Rienzi
Adele A. Keim*
Angela Wu Howard*
Laura Wolk Slavis*
Benjamin A. Fleshman*
Siena A. Marcelle*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095
mrienzi@becketfund.org

*Pro hac vice application
forthcoming

*Attorneys for Plaintiffs*

102

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Mother Mary Rose Heery, O.Carm., declare under penalty of perjury as follows:

1.      I am the Prioress General of the Carmelite Sisters for the Aged and Infirm. I am authorized to make this verification on behalf of the Carmelite Sisters for the Aged and Infirm, Inc., Ozanam Hall of Queens nursing Home, Inc., Cabrini of Westchester, and Marian Woods, Inc.

2.      I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning the Carmelite Sisters for the Aged and Infirm, Inc., Ozanam Hall of Queens nursing Home, Inc., Cabrini of Westchester, and Marian Woods, Inc. are true and correct to the best of my knowledge, information, and belief.

Dated: July 16, 2026

Mother Mary Rose Heery, O.Carm.
Prioress General
Carmelite Sisters for the Aged and
Infirm, Inc

103

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Mother Marie Edward Deutsch, OP, declare under penalty of perjury as follows:

1. I am the Mother General of the Dominican Sisters, Congregation of St. Rose of Lima (Dominican Sisters of Hawthorne) and President of the Servants for Relief of Incurable Cancer. I am authorized to make this verification on behalf of the Dominican Sisters of Hawthorne and the Servants for Relief of Incurable Cancer d/b/a Rosary Hill home.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning the Dominican sisters of Hawthorne and the Servants of Relief for Incurable Cancer d/b/a Rosary Hill Home are true and correct to the best of my knowledge, information, and belief.

Dated: _July 16, 2026_

_Mother Marie Edward, OP_

Mother Marie Edward Deutsch, OP
Mother General
Dominican Sisters, Congregation of St. Rose of Lima

104

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Sr. Justyna (Agnieszka Owsiejko, O.S.B. under penalty of perjury as follows:

1. I am the Superior of the Huntington Community of the Missionary Sisters of St. Benedict and the President of the Missionary Sisters of St. Benedict, Inc. I am authorized to make this declaration on behalf of the Missionary Sisters of St. Benedict, Inc. and the Missionary Sisters of St. Benedict Home for the Aged, Inc., d/b/a St. Joseph's Home for the Aged.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning the Missionary Sisters of St. Benedict, Inc. and the Missionary Sisters of St. Benedict Home for the Aged, Inc., d/b/a St. Joseph's Home for the Aged are true and correct to the best of my knowledge, information, and belief.

Dated: _07/16/2026_

Sr. Justyna (Agnieszka Owsiejko),
O.S.B.
Superior
Huntington Community of the
Missionary Sisters of St. Benedict

105

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Fr. Eric Fasano, J.C.L., declare under penalty of perjury as follows:

1. I am the Vicar General and Moderator of the Curia for the Diocese of Rockville Centre. I am authorized to make this verification on behalf of the Most Reverend Bishop John O. Barres and the Roman Catholic Diocese of Rockville Centre.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning Bishop Barres, the Diocese, the Catholic Church's teachings on end-of-life care, and the Ethical and Religious Directives are true and correct to the best of my knowledge, information, and belief.

Dated: 7/17/2026

Fr. Eric Fasano, J.C.L.
Vicar General and Moderator of the Curia
Roman Catholic Diocese of Rockville Centre

106

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, James P. O'Brien, Jr., declare under penalty of perjury as follows:

1. I am Senior Vice President and General Counsel at Catholic Health System of Long Island, Inc., d/b/a Catholic Health. I am authorized to make this declaration on behalf of Catholic Health System of Long Island, Inc., d/b/a Catholic Health.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning Catholic Health System of Long Island, Inc., d/b/a Catholic Health are true and correct to the best of my knowledge, information, and belief.

Dated: 7/16/2026

James P. O'Brien, Jr.
Senior Vice President and General Counsel
Catholic Health System of Long Island, Inc.

107

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Mother Alice Marie Monica, L.S.P., declare under penalty of perjury as follows:

1. I am the Mother Provincial for the Baltimore-Brooklyn Province of the Little Sisters of the Poor. I am authorized to make this declaration on behalf of Home for the Aged of the Little Sisters of the Poor, d/b/a Queen of Peace Residence, and Home for the Aged of the Little Sisters of the Poor of the City of New York, d/b/a Jeanne Jugan Residence.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning Home for the Aged of the Little Sisters of the Poor, d/b/a Queen of Peace Residence, and Home for the Aged of the Little Sisters of the Poor of the City of New York, d/b/a Jeanne Jugan Residence are true and correct to the best of my knowledge, information, and belief.

Dated: July 16, 2026

Mother Alice Marie Monica, L.S.P.
Mother Provincial
Baltimore-Brooklyn Province of the Little Sisters of the Poor

108